[S. F. No. 5408. In Bank.—May 24, 1912.]

## CITY OF OAKLAND (a Municipal Corporation), Appellant, v. OAKLAND WATER FRONT COMPANY (a Corporation), Respondent.

WATER FRONT OF OAKLAND—GRANT TO CARPENTIER—LAW OF CASE.— The decision on the first appeal in this case, reported in 118 Cal. 160, is the law of the case as to the nature and physical extent of the grant of its water front made by the city of Oakland to Horace W. Carpentier, and that the state had power to make the grant, but as there was not a concurrence of four justices upon the precise question as to when in point of time and by virtue of what acts the city parted with and Carpentier acquired title, it is not the law of the case that such title was first acquired in 1868.

ID.—DEDICATION OF STREETS OVER WATER FRONT—INEFFECTUAL ATTEMPT TO DEDICATE OVER UPLANDS.—The town of Oakland was never a pueblo, and the attempts made by it in the early fifties to dedicate, by ordinance, certain streets over the privately-owned uplands and

marsh lands, some to high tide, others to low tide, and still others to the southern or western boundary of the town, amounted to nothing, since the town and the city of Oakland its successor, had no ownership in or control over these lands, and did not undertake to perfect these incipient dedications by purchase or condemnation of such land. The utmost result that could be claimed for such efforts is that they operated to set apart for public use strips of the width of the non-existing streets projected along the lines thereof over the mud flats between high and low tide.

Id.—Revocation of Dedication of Streets by State—Delegation of Power to City of Oakland—Compromise Act of 1868.—Assuming that such strips across the mud flats unconnected with the high lands were dedicated though unused streets, the legislature had full power to vacate such dedications, even if affected by a public use, or to delegate such power, as was done in the plenary act of settlement and compromise of March 21, 1868 (Stats. 1868, p. 222).

Id.—Compromise of Controversies with Carpentier—Revocation of Dedication of Streets over Water Front.—The compromises of the controversies affecting the water front of the city of Oakland, previously existing between it and Horace W. Carpentier, which were entered into by the city in pursuance of the authorization conferred by the act of March 21, 1868, and the various ordinances enacted by the city, which are set forth in the prior opinion in this case, had the effect to revoke the dedication of such unused streets crossing such mud flats.

Id.—Ratification of Deed of Oakland Water Front to Carpentier—Effect of Deed—City Estopped to Assert Existence of Streets.—The power to ratify the deed previously executed by the municipality to Carpentier in 1852 was necessarily conferred by the state under the act of 1868, authorizing the city to settle, adjust, and compromise "any and all claims, demands, controversies, and causes of action in which said city is interested," and such a ratification operated as of the date of the originally invalid conveyance. Such ratification was effectuated by the declaration in the compromise ordinance that the said deed to Carpentier was "valid, binding and ratified and confirmed." This declaration, in the absence of express reservation, negatives the idea of any encumbrances by easements or otherwise, such as a public street, upon the water-front property conveyed, and by the use of the word "grant" in the deed, the city is estopped as against its grantee to assert anything in derogation of its deed.

Id.—Deed by City in Solido Is Revocation of Dedication.—A deed *in solido* by a municipality, without reservation of easements or streets, itself operates as a revocation of such portions of the property conveyed as were dedicated as streets.

Id.—Conduct of City Subsequent to Compromise Shows Intent to Revoke Dedication.—That the city of Oakland not only did, but intended to, revoke its dedication of such streets, is shown by its

conduct subsequent · to such compromises, such as consenting to various judgments against it affecting the water-front property conveyed to Carpentier, without reservation as to streets, making repeated efforts to condemn for street purposes the very property which it here claims was dedicated to such purposes, assessing and collecting taxes on such property, selling the same for non-payment of taxes assessed thereon, and taking conveyances from the successor in interest of Carpentier for street purposes of portions of such property.

APPEAL from an order of the Superior Court of Alameda County. F. B. Ogden, Judge.

The facts are stated in the opinion of the court, and in the opinion on the prior appeal herein, reported in 118 Cal. 160.

Wm. A. Davis, W. Lair Hill, H. A. Powell, Ben. F. Woolner, City Attorney, and J. W. Stetson, City Attorney, for Appellant.

A. A. Moore, W. F. Herrin, Stanley Moore, and W. H. Orrick, for Respondent.

THE COURT.—This is a second appeal and is from the order denying plaintiff's motion for a new trial. The first appeal is reported in 118 Cal. 160, [50 Pac. 277]. The history of the case will there be found set forth at length, and need not here be repeated. The nature and physical extent of the city's grant to Carpentier were there defined and delimited. That definition and delimitation have become the law of the case. In the opinion of the chief justice, concurred in by two of the associate justices, it was held that Carpentier took title by virtue of the ordinances and deeds under the compromise of 1868, entered into by authority of the statute of March 21, 1868, (Stats. 1867-68, p. 222). Two justices, specially concurring, held that Carpentier acquired title, not by virtue of this compromise, but by virtue of earlier ordinances, deeds and ratifying statutes. It is proper to note that as there has not been the concurrence of four justices upon the precise question as to when in point of time and by virtue of what acts the city parted with and Carpentier acquired title, it cannot be said to be the law of the case that such title was first acquired in 1868. (*Roche* v. *Baldwin,* 143 Cal. 186, [76 Pac.

956] ; *Philbrook* v. *Newman,* 148 Cal. 172, [82 Pac. 772] ; *Los Gatos etc. Ry. Co.* v. *San Jose Ry. Co.,* 156 Fed. 455, [13 Ann. Cas. 571, 34 C. C. A. 265] ; *Pollock* v. *Hennicke Co.,* 64 Ark. 180, [46 S. W. 185].) Two of the justices, believing that such title had been acquired before 1868, and three believing that it had been acquired in 1868, the result was a consensus of opinion of five that at least in 1868 such title was vested in Carpentier. Two justices dissented. They held the view that the grant to Carpentier was void within the principle announced in *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 110], that the state itself could not make such a grant, and therefore it could be made by no agency of the state; that because the grant was thus void as an abdication of a trust upon which the sovereign state held these lands, no ordinances or statutes of confirmation or ratification, and no consent judgments could operate to give it validity. These dissenting justices were not called upon to express and did not express their views as to when and how title vested in Carpentier, conceding the power of the state to make the grant.

It has, however, become the settled law' of the case that the state had power to make the grant, the chief justice expressing the following determination which was concurred in by four of his associates: "A grant by the state of California, therefore, of mud flats and shoals between high and low tide on the margin of the bay of San Francisco cannot be held to have been in excess of the legislative power, in the absence of any proof that such grant has seriously impaired the power of succeeding legislatures to regulate, protect, improve, or develop the public rights of navigation or fishery, and in this case it does not appear that the grant to Oakland, as here construed, would have that effect if transferred to a natural person or private corporation. It is true that the private ownership of the shore may prevent access to the navigable waters of the bay, but so does the private ownership of the upland prevent access to the shore and to the navigable waters in the same sense and to the same extent. This, however, is a minor and temporary inconvenience for which our laws and the laws of all civilized states provide an ample remedy. By the exercise of the right of eminent domain all necessary means of access from the uplands to the water front may be

condemned for the public use, at a cost not in excess of the
reasonable value of the land taken or subjected to the servi-
tude.   And there is no injustice in requiring this compensa-
tion to be made to the grantee of shore lands when his right
to such lands is in other respects valid in law; for, like other
holders of title derived from the state, he is presumed to have
given what, at the time of the grant, was deemed a fair
equivalent for the land granted."

The chief justice further said:   "The conclusion, I think,
necessarily follows that from and after the second day of April,
1868, the city of Oakland ceased to be the owner as trustee,
or otherwise, of any portion of her water front except those
portions secured to her by the compromise of that date, and
such streets, thoroughfares, and other parcels as may have
been previously dedicated to public use.   As to all such places
the transfer to the Water Front Company and its assigns was
subject to the public easement, and the city as trustee for the
public is no doubt entitled to a decree in this action defining
her right of control over the lands so dedicated.   With respect
to such streets and public places, the various consent decrees,
relied upon by defendant, constitute no estoppel, and the
statute of limitations does not apply."

This language cannot be held to embody any law of the case.
It is the decision of but three justices and is necessarily at
variance with the views of the two justices especially concur-
ring, for, by the views of those justices, Carpentier acquired
title long prior to 1868, and his acquisition of title on any
such earlier date would certainly render any subsequently
attempted dedication by the city of streets over his land a
mere nullity, yet the language quoted implies that the city of
Oakland retained control of such streets and thoroughfares
"as may have been previously (previous to the compromise
of 1868) dedicated to public use."   The dissenting justices, of
course, presented no views upon this matter, and for aught
that appears, or can be made to appear, if the power of the
state to make such a grant were admitted, they might have
concluded that the original grant to Carpentier was valid, or
that it was made valid by the act of 1861, or by one or another
of the judgments given in the case.   Moreover, the language
quoted cannot be construed as a finding, much less a deter-
mination, that there were any such streets.   Not only had no

question of dedicated streets been presented in the case, but the very evidence here introduced, of the maps and dedicatory ordinances, were not in the record upon the former appeal. Nor was there determined upon that appeal the mode by which Carpentier and his successors acquired title, the court limiting its declarations in this respect to the statement that the act of 1868 contemplated and was "comprehensive enough to sustain a transfer" of all the property in controversy. Not having been called upon to discuss, and not having discussed, the specific terms of the compromise and the nature of the title taken under it, those questions are untouched and undetermined.

The town of Oakland was never a pueblo. Surrounding its uplands, which were all held in private ownership, were marsh lands which, generally speaking, extended from the line of extreme high tide, where the upland grasses and the marsh grasses came together, to the line of ordinary high tide, which marked the limit of vegetation. This land also was held in private ownership. The water front owned by the town of Oakland consisted of the mud flats lying between the line of high and low tide. Following the conveyance to Carpentier in the early fifties, the town of Oakland from time to time passed ordinances dedicatory of certain streets. In some instances maps were referred to. Some of these ordinances purported to dedicate such streets to high tide, others to low tide, still others to the southern or western boundary of the city. Because of the conditions above adverted to these attempts to dedicate streets over the uplands and marsh lands amounted to nothing, since the town and the city, its successor, had no ownership in or control over these lands, and did not undertake to perfect these incipient dedications by purchase or condemnation of such lands. The utmost result that could be claimed for such efforts is that they operated to set apart for· public use the sixty-, or seventy-, or eighty-foot strips projected along the line of the non-existing streets over the mud flats between the high and low tide. We need not pause here to consider whether when a municipality makes a dedication to the public over its own lands the so-called dedication amounts to anything more than an offer, until accepted by the use of the public or by the acts of the municipal authorities in rendering the property so dedicated available to public use. It

may be conceded that the dedication was complete so far as the municipality was concerned without any further act upon its part or upon the part of the public. Certain it is, however, that the town or city did nothing more than to pass these ordinances, that it never in any wise developed these so-called streets, and that the public to this day has never used them. Treating these strips across the mud flats unconnected with the high lands as dedicated though unused streets, that the legislature had full power to vacate such dedications (even if affected by a public use, as was not the case here), or to delegate this power, as was done in the plenary act of settlement and compromise of 1868, is beyond question. Says the court in *Polack* v. *Trustees of the S. F. Orphan Asylum,* 48 Cal. 490: "That the legislature possesses competent power to vacate a street in a city; that the legislature may delegate or commit such power to the municipal authorities of the city; that its exercise by the municipal authorities is dependent on the will and subject to the control of the legislature; and that after such power has thus been committed to the municipal authorities, the legislature may revoke it in part as well as in whole, or, without an express revocation, may itself exercise it in any particular instance, are propositions about which there can be no controversy in this state." (See, also, *Brook* v. *Horton,* 68 Cal. 554, [10 Pac. 204] ; *San Francisco* v. *Burr,* 108 Cal. 460, [41 Pac. 482].)

The real question, then, is, Did the legislature, acting through its authorized agent, the city of Oakland, revoke such offers of dedication or vacate such unused streets? To this question, not only the terms of the compromise itself, but every act of the city therein and thereafter, make possible but one answer. Such dedications were unquestionably revoked.

It is said in the opinion of the chief justice upon the former hearing, speaking of the controversy which the legislature authorized to be compromised, that if ever there was "a flagrant and notorious controversy over anything, there certainly was such a controversy between Carpentier and the city of Oakland over this water front." A very vital part of this controversy raged over these so-called streets and the easements which the city was contending were being imposed upon these lands, and which Carpentier was insisting could not be imposed by virtue of the fact that he held them in private owner-

ship. The settlement of this controversy over these streets was, therefore, a part, and as necessary a part, of the compromise which was entered into with Carpentier as was any other term, covenant, or condition of it. The plenary power of the state to effect such revocation and its delegation of power to the city have been adverted to. The statute of 1868 itself was not a mere authorization to grant or alienate the property in controversy. It was enacted with special reference to the strife that had grown up over grants previously made, and it empowered the city "to compromise, settle, and adjust any and all claims, demands, controversies, and causes of action" growing out of such previous transactions, and the resultant disputes which arose out of them. One of the moving impulses to the adjustment was Oakland's desire to secure for itself the terminus of the first trans-continental railroad which had proposed entering San Francisco by another route. A portion of these lands was to be given by the terms of the compromise to the railroad, and upon this gift and the vesting in the railroad company of "a good title in fee simple" (such is the language of the compromise) of the property, the railroad company would expend at least a half a million dollars thereon, and would make Oakland a terminal point. The validity of Carpentier's title in this compromise was recognized, first, by the fact that under it he was to convey all these lands to respondent herein. The respondent was to convey certain of them to the railroad company and certain others expressly described to the city of Oakland. The city of Oakland bound itself "to the performance and execution by the municipal authorities of the city of Oakland of all instruments, ordinances and proceedings necessary to perfect, complete and make good the title" to the property conveyed by Carpentier to respondent. Carpentier conveyed to the respondent *in solido*, and the deeds from respondent to the city and to the railroad company of their lands followed in due course. The city is still holding the property so conveyed to it. The language of the ordinances of the city of Oakland in settlement of the controversies is set forth in full in the previous opinion in this case. That these ordinances were carefully drawn may not be doubted. Lawyers of the greatest learning were employed upon either side. The ordinances do not pretend to make a new grant of the property or of any part of it. They set forth

the earlier ordinances of the city granting these lands to Carpentier, the deed of the mayor following such ordinances, and with the declaration that all claims, demands, controversies, disputes, litigations, and causes of action heretofore existing between the city of Oakland and Carpentier and his assigns are compromised, settled, and adjusted, announce that "The said above mentioned ordinances and conveyances are made valid, binding and ratified and confirmed, and all disputes, litigations, controversies and claims in and to the franchises and property described in said ordinances and deeds of conveyance and every part thereof are abandoned and released by the said city of Oakland to the said Carpentier and his assigns." Then follow specific conditions, and even reservations. The Oakland Water Front Company, respondent herein, is to make certain conveyances to the railroad company and to "other parties" which included the city of Oakland, and, as a reservation, nothing is deemed to affect the rights of the San Francisco and Oakland Railroad Company, derived under an ordinance of the city, nor the reversion of the property of the Western Pacific Railroad Company to the city of Oakland. In an ordinance passed the next day, which declared the due execution by the respondent of all which it was called upon to perform, there is a further ratification and confirmation, and another declaration that "all disputes, controversies, claims, demands and causes of action heretofore existing between the said city of Oakland on the one part and Horace W. Carpentier and his assigns on the other part relating to the force and validity of said ordinances and deed are hereby abandoned and released by the said city of Oakland to said Carpentier and his assigns." In this agreement it has been said the city took certain of these water front lands with their streets from the respondent. It is impossible to conceive of language which more completely evinced a settlement of the controversy of streets or no streets, effective dedications or ineffective dedications, than that here employed, and this language is susceptible of but the one construction, the abandonment of the city's claims in this regard, and the revocation of any dedications previously attempted to be made. This is borne out not only by the language above quoted, but by the fact that it is Carpentier's deed and not the deed of the city which, in the compromise, formed respond-

ent's recognized muniment of title, and by the even more significant fact that the city itself deliberately ratified its original grant to Carpentier.

The power to ratify was necessarily a power conferred by the state under the act of 1868 authorizing the city to settle, adjust, and compromise and the ratification is as complete when made by an authorized agent of the authority having the power to ratify as though made by that authority itself. (*Bissell* v. *City of Jeffersonville*, 24 How. 126, [16 L. Ed. 664].) Nor can any exposition be needed of the well-settled principle that ratification operates as of the date of the originally invalid act. (1 Abbott on Municipal Corporations, sec. 281; *Boggs* v. *Merced Mining Co.*, 14 Cal. 279; *Zottman* v. *San Francisco*, 20 Cal. 96, [81 Am. Dec. 96]; *City of Monterey* v. *Jacks*, 139 Cal. 542, [53 Pac. 436].) There is then a declaration by the city of Oakland that the grant by itself to Carpentier of 1852 is in all respects binding. This declaration, in the absence of express reservation, negatives the idea of any encumbrances by easements or otherwise upon the property, and by the very use of the word "grant" the city "is estopped as against its grantee to assert anything in derogation of its deed." (10 Cyc. 626.) It was a covenant on the part of the city that the water front was not burdened with encumbrances by way of easements or otherwise, for that a public highway is an encumbrance which will be held to be a breach of a covenant stipulating that there are no encumbrances is well settled. (*Kellogg* v. *Ingersoll*, 2 Mass. 96; *Pritchard* v. *Atkinson*, 3 N. H. 335; *Kellogg* v. *Molin*, 50 Mo. 496, [11 Am. Rep. 426].)

As little question can there be over the intent appearing in these compromise ordinances to revoke any such dedications. If what has already been pointed out does not make this plain, there is the added consideration that a deed *in solido* without reservation of easements or streets, such a deed as was here made, itself operates as a revocation. (*Hayward* v. *Manzer*, 70 Cal. 476, [13 Pac. 141]; *Schmitt* v. *City and County of San Francisco*, 100 Cal. 302, [34 Pac. 961]; *Sacramento* v. *Clunie*, 120 Cal. 29, [52 Pac. 44; *Los Angeles* v. *Kysor*, 125 Cal. 463, [58 Pac. 90]; *Myers* v. *City of Oceanside*, 7 Cal. App. 87, [93 Pac. 686]; *San Francisco* v. *Calderwood*, 31 Cal. 585, [91 Am. Dec. 542]; *San Francisco* v. *Canavan*, 42

Cal. 541; *People* v. *Williams,* 64 Cal. 498, [2 Pac. 393]; *Demartini* v. *San Francisco,* 107 Cal. 402, [40 Pac. 496]; *Shulz* v. *Redondo Improvement Co.,* 156 Cal. 439, [105 Pac. 118].) Instructive upon this is the case of *Hoboken* v. *Pennsylvania R. R. Co.,* 124 U. S. 656, [31 L. Ed. 543, 8 Sup. Ct. Rep. 643], which offers some features of great similarity to those presented in this consideration. The original owner of the land upon which the city of Hoboken stands, Stevens by name, caused a plan of the city to be made and filed, which plan exhibited numbers of streets running north and south and east and west, which latter streets upon the map terminated at the eastern end of the high-water mark of the Hudson River. Lots were sold in accordance with the plan. Stevens's title went to high water and subsequently the state sold certain of the lands below high water to the Hoboken Land and Improvement Company. The latter filled in its property and claimed title in fee simple. The claim of the city was that the land lying at the extremities of the streets was subject to an easement in favor of the public for street purposes under the principle that when a street is carried to high water an easement attaches in favor of the public for wharf and similar purposes to the lands under the waters beyond, and this easement will be continued over any filled land which otherwise would cut off access from the street to the water. But the supreme court of the United States, all the judges concurring, declared that if any such easements existed, they were extinguished by the action of the state in conveying the property to the Hoboken Land and Improvement Company without reservation of such easements, the court saying: "The grant, being from the state, creates an estoppel against the estoppel; for the state, in respect to the easements claimed, is the representative of the public, superior in authority and paramount in right to the city of Hoboken; and, as we have already seen, the existence of the easement defeats the grant of the state. The state, therefore, being estopped by its grant is estopped to deny its effect to extinguish the public right to the easement claimed. The right insisted upon in these actions by the city of Hoboken is the public right, and not the right of the individual citizens, claiming by virtue of conveyances of lots abutting on streets made by Stevens or his successors in the title. The public right represented by the

plaintiff is subordinate to the state, and subject to its control. The state may release the obligation to the public, may discharge the land of the burden of the easement, and extinguish the public right to its enjoyment. Whatever it may do .in that behalf conclusively binds the local authorities when, as in the· present cases, the rights of action asserted are based exclusively on the public right."

Again, it is to be remembered that the act of 1868 authorized the compromise, adjustment, and settlement of all "causes of action" in which the city was interested. There can be no question but that a consent judgment becomes *res adjudicata* between the parties. (*Holmes* v. *Rogers,* 13 Cal. 191; *Semple* v. *Wright,* 32 Cal. 659; *McCreery* v. *Fuller,* 63 Cal. 31; *Crossman* v. *Davis,* 79 Cal. 603, [21 Pac. 963]; *Nashville etc. Ry. Co.* v. *United States,* 113 U. S. 261, [28 L. Ed. 971, 5 Sup. Ct. Rep. 460].) In City of Oakland *v.* Oakland Water Front Company (No. 115, superior court of Alameda County), the city stipulated that the respondent herein should "have a final judgment against plaintiff quieting the title to the lands described in its cross-bill or complaint." These lands were all of the property here in controversy without reservation as to the streets.

Again, in the cases of Central Pacific Railroad Co. *v.* City of Oakland (No. 5330, superior court of Alameda County), Central Pacific Railroad Co. *v.* City of Oakland (No. 5331, superior court of Alameda County), and Huntington *v.* City of Oakland (No. 2209, United States circuit court, ninth circuit), under disclaimers filed by the city pursuant to an ordinance of the city council, it was adjudged and decreed that the city of Oakland had no right or title or interest in or to any of the lands there in question which are included in the property involved in the present appeal. Says the supreme court of Indiana (*Parrish* v. *Ferris,* 2 Black, (U. S.) 606, [17 Sup. Ct. Rep. 317]) : "If the judgment is in favor of the plaintiff and declares that he has title in fee simple, and that the defendant's claim is unjust and unfounded, every possible interest of the latter in the land is cut off. He cannot afterwards assert that he has an easement in the land."

We need not consider how far these judgments operate to estop the appellant. They are certainly strong evidence upon the matter of revocation. They show that in none of these

instances was the city endeavoring to protect what it now claims to be its streets, though it is inconceivable that if it had believed it had any streets it would not have done so. Aside from the plain language of the ordinances and from the other considerations above discussed, the interpretation by conduct of one or the other of the parties is always of value. And so further in this connection it may be pointed out that the city repeatedly made efforts to condemn for street purposes the very property which it here claims was dedicated to street purposes. It has assessed and collected taxes upon the property claimed as streets. It has sold this property for the non-payment of taxes assessed thereon. It has taken conveyances from respondent for street purposes of some of the property within the lines of some of the asserted streets. All these matters and things, with the language of the compromise itself and the provisions of the agreement of compromise to the effect that the city of Oakland "should perfect, complete and make good" the title of respondent to the property conveyed to it by Carpentier, make it manifest not only that the city did revoke its dedications, complete or inchoate, but that it thoroughly understood that it had done so and continuously acted upon such understanding.

For these reasons the order appealed from is affirmed.

Beatty, C. J., did not participate in the foregoing decision.