## UNITED STATES v. CERTAIN PARCELS OF LAND IN LOS ANGELES COUNTY et al.

### Civil Action No. 2597.

District Court, S. D. California, Central Division.

Sept. 18, 1945.

Joseph F. McPherson, Sp. Asst. to Atty. Gen., and Irl D. Brett, Sp. Asst. to Atty. Gen., for the United States.

A. W. Nordstrom, Asst. City Atty., and C. N. Perkins, Deputy City Atty., both of Los Angeles, Cal., for City of Los Angeles.

George K. Whitworth, Deputy City Atty., of Los Angeles, Cal., for Department of Water and Power, City of Los Angeles.

E. E. Bennett, Edward C. Renwick, and Malcolm Davis, all of Los Angeles, Cal., for defendants Los Angeles & Salt Lake R. Co., and the Union Pac. R. Co.

E. E. Bennett, of Los Angeles, Cal., for Union Pacific Ry. Co.

J. F. T. O'CONNOR, District Judge.

*(1) Pertinent facts alleged in the amended complaint and in the answer of the defendant City of Los Angeles thereto.*

The United States of America has filed an amended complaint in condemnation in this court on September 7th, 1943, against certain parcels of land in the County of Los Angeles, State of California, designated as parcels 4, 5, 6, 7, 8, 9, 10, 11 and 12; County of Los Angeles, a body politic and corporate; State of California, a corporation sovereign; Los Angeles & Salt Lake Railroad Company, a corporation; Union Pacific Railroad Company, a corporation; and the City of Los Angeles, a municipal corporation, "to take, acquire, condemn and hold * * * an easement of right of way together with the exclusive use and occupancy of said lands, improvements and personal property, if any, used in connection therewith, and appurtenances thereto, subject however to the rights of way specifically described and excepted in the individual parcel descriptions hereinbefore set forth, and subject also to existing pipe lines, pole lines, sewer lines, storm drains, all underground structures now in place, commencing as of the effective date of the order giving immediate possession made by the Honorable Ben Harrison, United States District Judge, on the 25th day of November, 1942, of the lands described in the complaint on file in this action and continuing *for a period of two years thereafter with the irrevocable right of renewal from year to year thereafter for three additional years* by notice given not less than thirty days prior to the expiration of any year; that in the event plaintiff should terminate said easement then and in that event the right is reserved in plaintiff during the existence of such easement and such use and occupancy to make alterations, attach fixtures, erect additions, structures or signs, in or upon the premises, which fixtures, additions, structures or signs so placed in or upon or attached to said premises shall be and remain the property of the plaintiff and may be removed therefrom by the plaintiff at any time prior to the termination of said easement. That such easement is to be acquired free and clear and discharged of all liens, encumbrances, servitudes, easements, charges, demands, claims, restrictions and covenants whatsoever except as hereinbefore specifically provided." (Italics supplied.)

An order for immediate possession therefor was signed by Judge McCormick of this court and filed on September 7, 1943.

The defendant City of Los Angeles, a municipal corporation, which may hereinafter be referred to as the City for brevity, appeared separately and filed an answer on May 11, 1944, to the amended complaint in connection with parcels 5, 6, 7, 10 and 11; and states that as far as

the City of Los Angeles is concerned, only five of the parcels in and to which the said easement of right of way is sought to be condemned, affect property in which the city is interested (page 2 of defendant City's opening brief). It admits that it is the owner in fee simple absolute of that real property described in paragraph III of the amended complaint and numbered parcels 10 and 11.[1]

The defendant city alleges in its opening brief (page 2) that the Harbor Department of the city in its *proprietary* capacity is in possession and control of parcels 10 and 11 (Stipulation of Facts, Par. 1, p. 1). According to counsel, there never has been a road of any kind on parcels 10 and 11; and it seems that, at the date of the taking, these two parcels were under lease to the California Shipbuilding Company by the city for parking lots. The Government disputes the fact that parcels 10 and 11 are held *proprietarily* by the city, but does not deny the fee simple title of the city thereto (Government's brief, pages 1 and 2). These parcels, 10 and 11, colored green on Government's exhibit 1 in evidence, are described by Mr. McPherson, counsel for the Government, as small irregular slivers of land which lie near the southern end of the Government's taking (Reporter's transcript of proceedings on pre-trial hearing, page 11.) (Government's brief, page 3.) It is quite possible that an agreement will be reached as to parcels 10 and 11, and that the issue as to these two parcels will not be tried.

As to parcels 5, 6 and 7, the defendant city alleges that it has, and is the owner of, an easement, right of way, and the right to use and occupancy for roadway and highway purposes all that real property described in paragraph III of the amended complaint, by a degrees, minutes and seconds description; and that said easement, right of way and the right to the use and occupancy of said parcels 5, 6 and 7 will terminate on or about April 2, 1964.

As to parcels 5, 6 and 7, the defendant city alleges that the value of the interests and rights sought to be acquired and condemned by the plaintiff in and to the real property, designated as these parcels in the plaintiff's amended complaint, and the just compensation, *exclusive of any compensation for any rights or interests under the management or control of the Department of Water and Power of the City of Los Angeles,* to which the defendant City of Los Angeles, a municipal corporation, is entitled therefor, is, as to parcel 5, $58,000.00; as to parcel 6, $125,000.00; and as to parcel 7, $7,000.00. (Italics supplied.)

As to parcels 10 and 11, the defendant City of Los Angeles alleges that the value of the interests and rights sought to be acquired and condemned by the plaintiff in and to the real property designated in plaintiff's amended complaint and the just compensation, *exclusive of any compensation for any rights or interests under the management or control of the Department of Water and Power of the City of Los Angeles,* to which the defendant City of Los Angeles, a municipal corporation, is entitled, is the sum of $12,500.00 for parcel 10, and $600.00 for parcel 11. (Italics supplied.)

The defendant State of California has filed a disclaimer under date of October 14, 1943; and, therefore, is out of the case.

The defendant City of Los Angeles is the only defendant that has answered the amended complaint, and this ruling of the court affects necessarily only the issues raised between the United States and the City of Los Angeles, and parcels 5, 6, 7, 10 and 11 exclusively, although very little will be said with respect to parcels 10 and 11, as a ruling thereon is not particularly important at this time. The Government and the city may settle their differences, before trial, as to parcels 10 and 11.

Counsel for the City of Los Angeles at the pre-trial hearing waived any objection to the validity of the action of the Government or the right to condemn, or that the taking was for a public purpose. (Reporter's transcript of proceedings on pre-trial hearing, p. 6.)

For a better understanding of the facts in this case, a sketch is appended hereto showing the lands sought to be condemned

---

[1] These two parcels are former tidelands that were granted to the City by Acts of the Legislature of the State of California approved May 1, 1911 and April 20, 1917, Cal.Stats.1911, c. 656, p. 1256; Cal.Stats. 1917, c. 115, p. 159. Said grants were made upon condition that said tidelands and submerged lands be forever held by said City in trust for certain purposes." (Page 2 of City's opening brief.)

and dealing with parcels 5, 6, 7, 10 and 11:

Parcel 5 is a highway approximately sixty feet wide extending southerly from Ana-

Case No. 2597 O'C. Civ. U. S. v. Land.
Sketch not drawn to scale but merely illustrative.

heim Street to the north side of the Bascule Bridge, also referred to at times as Henry Ford Avenue, Badger Avenue or Roadway No. 2. Parcel 6 is the bridge itself. Parcel 7 is a continuation of said sixty feet highway from the south side of the bridge to the converging of Dock Street or Railroad Avenue with Henry Ford Avenue on Terminal Island. Parcels 10 and 11 are slivers of land on Terminal Island marked in green on Government's Exhibit No. 1, a large map.

The portion of the road on either side of the bridge and the bridge itself lie within the territorial corporation known as Long Beach. (Reporter's transcript of proceedings on pretrial hearing, p. 22.) See stipulation filed on May 23, 1945, between the Government and the City of Long Beach.[2]

At the pre-trial hearing (Reporter's transcript of the proceedings thereat, p. 6) Attorney McPherson stated that "beginning at 150 feet south of Anaheim Boulevard, the railroad is. moved over so that they (the Government) take one-half of Badger Avenue going to the bridge, that is, the exclusive use of it. On the bridge proper they (the Government) take one lane or one-quarter of the bridge. They then continue on with one-half of the street south of the bridge so far as it proceeds along Badger Avenue. At that point it turns and goes in a southwesterly direction" (Reporter's transcript of the proceedings, p. 7); and the Government's position is that the sole and only question for the jury to decide is how much the City of Los Angeles is entitled to recover by way of compensation for the *exclusive* use by the Government of that portion of Badger Avenue including one lane (one-quarter) of the bridge (Reporter's transcript of the proceedings, p. 13), and contends that, for the taking, the city is entitled to only nominal damages.

The purpose of the condemnation proceeding, is to acquire an easement for the purpose of laying and operating an extension of the Pacific Electric Tracks for the exclusive use of the employees of the Cali-

fornia Shipbuilding Company and certain other designated employees (Reporter's transcript of proceedings at pre-trial hearing, p. 27.)

The tracks which have been placed upon the bridge, pursuant to the Government's taking in this proceeding, occupy substantially the same space, and have been constructed in substantially the same manner as those which were originally placed thereon on the westerly side of the bridge, at the time the bridge was constructed, and which remained in place until 1939. (Stipulation of Facts, page 24, lines 19 to 25.) "It will thus be seen that the use to which the Government (through its agent, the Pacific Electric Railway Company) is putting a portion of the westerly side of Henry Ford Avenue, including that portion thereof which is the Henry Ford bridge, is identical with the use for which the road and bridge were originally constructed, and in the same location, and constructed in a similar manner." (From Government's brief, p. 41.)

Defendant City contends that after parcels 5, 6 and 7 were taken, there remained only an average width of twenty-eight feet on Roadway No. 2 (Defendant City's reply brief p. 33); and that, therefore, the exact width taken will be a matter of proof.

*(2) Parcels designated as 5, 6 and 7 were proprietarily held by the City of Los Angeles at the time of the taking.*

Counsel for the City, at the pre-trial hearing, contended that the Harbor Department operates not only Badger Avenue, also designated as Henry Ford Avenue or Roadway No. 2, but a great many other streets upon Terminal Island, and that they have all been denominated and treated as private roadways owned in a *proprietary* capacity by the City of Los Angeles in name, and by the Harbor Department of the City of Los Angeles, as distinguished from a governmentally or *publically* operated capacity (Reporter's transcript of the proceedings at the pre-trial hearing, p. 17); and felt that the preliminary ques-

---

[2] " * * * the rights, if any, of the City of Long Beach, a corporate municipality, in and to the premises in question, or which arise by reason of the fact that the bridge, and a portion of the roadway in question lie within the corporate limits of the City of Long Beach, shall not be asserted herein. That as between the plaintiff and the City of Long Beach, just compensation for its rights, if any, shall be fixed and determined at one dollar ($1.00). Nothing in the stipulation contained shall be taken, held, or considered to be a waiver by the City of Long Beach of any of its rights, if any, as against the City of Los Angeles or the Union Pacific Railroad Company, or those claiming by, through, or under them."

tion to be decided by the Court, prior to the introduction of any evidence of value of the leasehold taken, is:

(1) Whether parcels 5 and 7, that is, the approximately sixty feet wide Henry Ford Avenue, also designated on the map as Roadway No. 2, and denominated by Attorney McPherson as Badger Avenue, and exter ling from Anaheim Street southerly a distance of over a mile and a half over and across the bridge and into Terminal Island, as well as the bridge itself, parcel No. 6, were held by the City and/or the Harbor Department in a proprietary or a governmental capacity; and

(2) What is the measure of value or compensation or damages to which the City and/or the Harbor Department is entitled for the taking, it being the Government's position that the interest of the City at the time of the taking of parcels 5, 6 and 7 was held in a governmental capacity, and the contention of the city being that the interest was held in a proprietary capacity.

Question No. 1 will be answered first, and question No. 2 will be answered under the next heading immediately following this one in this decision.

It is the purpose of a pre-trial hearing (Rule 16 of Federal Rules of Civil Procedure) to simplify the issues at the trial, and the Court has accordingly examined the exhibits on record, filed pursuant to the Stipulation of Facts filed on September 6, 1945; and, from the examination thereof, comes to the conclusion, and will hold at the trial, that parcels 5, 6 and 7, at the time of the taking by the Government on November 25, 1942, were held by the City of Los Angeles and/or the Harbor Department in a proprietary and not in a governmental capacity. The indication by the Court at this time of how it will rule on these points at the trial should materially assist and expedite counsel in the preparation and introduction of their proof on value.

It seems according to defendant City (defendant's opening brief p. 3) that all of these parcels, together with a large area of contiguous lands in all directions therefrom, were originally owned in fee by the Los Angeles & Salt Lake Railroad Company (now the Union Pacific Railroad Company). By two deeds, one in 1908 and one in 1918, the present Cerritos Channel area, connecting Los Angeles and Long Beach Harbors, was granted to the United States of America for free, public, navigable channel purposes only, by the Los Angeles and Salt Lake Railroad Company, with a provision for reverter if this use ceased (see Los Angeles & Salt Lake R. Co. v. United States, 9 Cir., 140 F.2d 436; Stipulation of Facts, par. 12, p. 20). The navigability or the non-navigability of the channel in question is not an issue in this case by reason of the condemnation proceedings and will not be discussed, it appearing that the channel is navigable and that the operation of the bridge in question does not interfere therewith.

The court has carefully considered the history of this land relating back to July 12, 1921; and, for the convenience of anyone interested in this ruling, will quote from the Memorandum of the defendant City of Los Angeles on pre-trial issues, filed May 22, 1945, which appears to give a correct and concise summary of the factual situation, as follows:

"On the 12th of July 1921, the City of Los Angeles and the Board of Harbor Commissioners and the said Los Angeles & Salt Lake Railroad Company entered into an agreement to accomplish many objects and adjust many difficulties. (This agreement parenthetically was supplemented by an agreement dated April 3, 1934.) The railroad company, among other things, granted to the City the right to use an area called Roadway No. 2, being generally a strip of land 60 feet wide and extending from Anaheim Street southerly a distance of over a mile and a half, nearly across Terminal Island. This roadway included Parcels 5 and 7 herein. The conditions of this grant of a right to use were generally:

"(1) That the City would within 3 years after obtaining a permit from the United States Government construct a bridge across Cerritos Channel;

"(2) That for 30 years Roadway No. 2 would be used by the City for roadway and highway purposes only (N.B. The word 'public' was *not* used to modify 'roadway' and 'highway.');

"(3) That Roadway No. 2 would be improved without expense to the railroad company;

"(4) That the City could not permit any railroad tracks upon Roadway No. 2, except 500 feet on each side of the bridge so as to be able to cross the bridge with tracks;

"(5) That the period of said use was to be 30 years, and to continue thereafter as long as the Company was permitted by the City to continue to use the bridge for one railroad track.

"In return the City granted a concurrent right free of charge to the Company to use the bridge when built for a track for operation of trains thereover. (Stipulation, par. 6, pp. 9, 10; Exhibit VII.)

"Said agreement 'Q,' dated July 12, 1921, had been previously approved by the Council of the City of Los Angeles by Ordinance No. 41,873 (New Series), adopted May 13, 1921 (Stipulation, par. 5, pp. 8 and 9; Exhibit VI.) At that time, as it does now, the Charter of the City of Los Angeles provided that 'whenever the Council * * * shall find and determine that the needs and requirements of commerce, navigation or fishery demand that additional territory, * * * be added thereto (i. e., the lands placed under the Board by the Charter itself), the Council shall have power, and it shall be its duty, to place such territory, by ordinance, under the control, supervision and management of the Board of Harbor Commissioners for the purposes of this article.' (Charter, Sec. 170; Stipulation, par. 21, p. 26.) Said Ordinance No. 41,873 (N. S.), in Section 4 thereof, placed Roadway No. 2 (i. e., now Badger Avenue) 'under the control, supervision and management of said Board.' (Stipulation, par. 5, pp. 8, 9.) The Council was thenceforth divested of all control over Roadway No. 2 and the Bascule bridge later erected thereon.

"Thereafter a bascule type bridge was completed as of April, 1924 across Cerritos Channel by the Harbor Department of the City of Los Angeles, and Badger Avenue was constructed and paved by the Harbor Department. The funds therefor were secured as follows:

"On April 24, 1919, Ordinance No. 38,-878 (New Series) of the City of Los Angeles was approved which called a special election and submitted the question of a $4,500,000 bond issue to the electors of the City. At said election said bonds were approved and subsequently issued in five series and sold. The terms of the proposition were such that the bonded debt was to be incurred for certain municipal improvements 'in connection with the development, improvement, maintenance, operation and control of the harbor and navigable waters of the City of Los Angeles, to wit: The acquisition, construction and completion of docks, wharves, transit sheds, warehouses, elevators, bunkers and storage facilities, railroads and terminals, channels, slips, waterways, breakwaters and jetties; *of highways and approaches, including the necessary bridges, tunnels and drawbridges, to and along the water front, including a truck highway directly connecting the inner and outer harbor;* of tugs, barges, dredges and other water craft, including a municipal ferry across the main channel; of protection dikes and levees; of equipment facilities and adjuncts necessary for the operation of said harbor and navigable waters; the reclamation of tide and submerged lands; and the acquisition of land necessary for said purposes, by purchase or condemnation.' (Stipulation, par. 4, pp. 4–6; Exhibit V.) A portion of the funds secured from a sale of these bonds was used to finance the construction of the bascule bridge by the Harbor Department. (Stipulation, par. 13, p. 20.)

"Historically, there were prior to 1909 three cities, San Pedro, Wilmington and Los Angeles. Representatives of the three cities appointed a Consolidation Committee, which filed a report with the legislative bodies of the three cities on June 8, 1909. The report recommended that 'for the purpose of establishing at San Pedro and Wilmington a great commercial distributing and manufacturing center, and the developing of both the inner and outer Harbors, Los Angeles, San Pedro and Wilmington should consolidate under one municipal government,' and that at least $10,000,000 be expended in the next ten years. With reference to Wilmington, the report recommended:

" 'Third—That a municipally owned and controlled ferry shall be at once established at Wilmington, connecting said portion of the consolidated city with Terminal Island. The same to be for the use and benefit of the people and only such charges shall be made as will pay the cost of operating and maintenance of the same, but in no event shall the fare exceed two cents, either going from or returning to Wilmington.' (Stipulation, par. 2, pp. 2, 3; Ex. I.) The Los Angeles Harbor Commission and the City Council of Los Angeles on June 8, 1909, approved this report by appropriate resolutions. (Stipulation Ex. II and III.)

"By ordinance of the City of Los Angeles, No. 18,414 (N. S.) approved July 13,

1909, Notice of Consolidation Election was given and an election called for August 12, 1909. By said election the three cities were consolidated into the City of Los Angeles. (Stipulation, par 3, p. 4.)

"Subsequent to the $4,500,000 Harbor Improvement Bond Election of 1919, the Board of Harbor Commissioners applied for a permit to construct a drawbridge across Cerritos Channel as per Tracings 4571 and 4571—1. Under date of October 1, 1921, the Secretary of War issued his permit to construct the bascule bridge upon certain conditions, none of which affect the manner of use or use of the bridge itself, so that the free navigation of the waterway shall not be unreasonably interfered with. (Stipulation, par. 10, p. 19; Ex. XV.)

"The Charter of the City of Los Angeles provides the duties of the Harbor Department as related to the City generally. From the Charter it appears that the Board of Harbor Commissioners is in possession and control of Los Angeles Harbor (Sec. 138), that it is authorized to acquire, erect, maintain and operate public utilities and facilities of a proprietary character connected with harbor development and to promote commerce and navigation (Sec. 139 (c), (f), (g)), and that all bond funds voted for harbor purposes and harbor revenue funds are subject to its control (Sec. 144). It will also appear from the Charter that all *public* streets and highways are under the control of the Council and Board of Public Works, and that the Harbor Department has no control over public streets and its revenues and bond funds cannot therefore be used for such purposes. (Stipulation, Ex. XXIII, and Secs. 233 and 234 therein.) In order, therefore, for the Harbor Department to have control of Badger Avenue and the bridge, and in order to carry out the mandate of the electors of the City, Roadway No. 2 and the bascule bridge *must be proprietary* facilities for harbor use, *and not a public street or highway.*

"The bridge and Roadway No. 2 have been so treated at all times by the Harbor Department and the City generally. Badger Avenue has been in the past and was in November, 1942, posted as a private roadway by the Harbor Department. The signs are located generally approximately at the north end of Parcel 5 and the south end of Parcel 7, and read:

" 'Notice. This roadway is not a public dedicated street. Permission to pass over same is subject to revocation at any time by the Board of Harbor Commissioners, City of Los Angeles.' (Stipulation, par. 16, p. 23.) The Harbor Department, prior to this action, charged certain common carriers (buses) toll for the use of the bridge and Roadway No. 2 (Stipulation, par. 15, pp. 22, 23; Ex. XIX.)

"After the bridge was constructed (1924), the agreement of 1921 was cancelled and a new one entered into, which constitutes the measure of the title of the City of Los Angeles in and to Parcels 5 and 7 of November 25, 1942.

"Agreement 194 and Order No. 1458 of the Board of Harbor Commissioners show the terms of the agreement now in force and effect under which the Harbor Department now holds Roadway No. 2. (Stipulation, par. 8, pp. 12-15; Ex. IX.)

"As further illustrating the intent of the City and the Harbor Department that Badger Avenue is a private, undedicated roadway held *proprietarily* by the City under the jurisdiction and control of the Harbor Department, the City Engineer under date of December 21, 1909, reported to the City Counsel concerning a proposal to change the name of Badger Avenue to Henry Ford Avenue. Attached to his report, as Exhibit A, was a map upon which Badger Avenue, south of Anaheim Street, was labeled "Private street under control of the Harbor Department." Pursuant to that report, the City Council on December 23, 1932, adopted Ordinance No. 72,200 which changed the name of Badger Avenue, north of Anaheim Street to Young Street, to Henry Ford Avenue. No attempt was made to legislate concerning the private portion of Badger Avenue south of Anaheim Street. (Stipulation, par. 14, pp. 21, 22; Ex. XVI and XVII.)" (Italics supplied.)

It has heretofore been stipulated that the City of Los Angeles and/or the Harbor Department at the date of the taking on November 25, 1942, held the fee simple title to parcels 10 and 11, the City of Los Angeles contending, however, that the fee simple title thereto was held in a *proprietary* capacity, while the Government contends that the fee simple title to said parcels 10 and 11 was held in a *governmental* or public capacity. Counsel have likewise stipulated that the defendant, City of Los Angeles, is the owner of the physical improvement crossing the Cerritos Channel (parcel 6) being a bascule bridge and known variously as the Cerritos Channel

Bridge, Badger Avenue Bridge and Henry Ford Avenue Bridge.

■ There can be no question from the stipulated facts and the other evidence in the case that the City of Los Angeles and/or the Harbor Department has a leasehold interest from the Los Angeles & Salt Lake Railroad Company expiring April 2nd, 1964, in parcels 5, 6 and 7, but the specific question of whether or not the City of Los Angeles and/or the Harbor Department held the leasehold interest in parcels 5, 6 and 7 from the said railroad company *proprietarily, or in a governmental capacity,* will necessarily have to be decided from the foregoing facts under the laws of the State of California, and the adjudicated decisions of the courts of this state, under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 114 A.L.R. 1487, which lays down the rule that:

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."

The California authorities, the Los Angeles City Charter and other documents presented by counsel for the City of Los Angeles, as well as the Stipulation of Facts filed on September 6, 1945, indicate to the satisfaction of the court that the City of Los Angeles and/or the Harbor Department had the power to hold the title or lease to these parcels 5, 6 and 7, *proprietarily* and the documents filed pursuant to the stipulation of facts, as a result of the pre-trial hearing, indicate that it was beyond the peradventure of a doubt the intent and purpose on the part of the City of Los Angeles and/or the Harbor Department to hold these lands *proprietarily.* While necessarily "intent" could not control in the absence of "power", nevertheless, with the existence of power, "intent" is highly persuasive of the fact.

Section 139(g) of the Charter of Los Angeles City, annotated (1941 Edition), states that "The Board of Harbor Commissioners shall have the power and it shall be its duty to acquire, erect, maintain or operate all such improvements, utilities, water craft, appliances or facilities as it may deem necessary or *convenient for the promotion and accommodation of com-*

*merce,* navigation and fishery, or for use in connection therewith, or upon the lands and waters under the control and management of said board;" (Italics supplied.)

■ As indicated in the Memorandum of defendant City, filed May 22, 1945, the City of Los Angeles has power to acquire, construct and maintain such harbor improvements as docks, wharves and warehouses. Clark v. City of Los Angeles, 160 Cal. 317, 116 P. 966; City of Long Beach v. Lisenby, 175 Cal. 575, 166 P. 333.

■ The operation of a bridge and private roadway, in connection with the business of leasing lands, operating wharves and docks, and managing a harbor and the industries using the same would, it seems to the court, be a *proprietary function.* As further stated by the City in its opening brief "A city does not act in a legislative capacity in administering a public utility, such as a water system, even within its own limits, but in a *proprietary* and only quasi-public capacity. Marin Water & Power Co. v. Town of Sausalito, 168 Cal. 587, 143 P. 767; Nourse v. City of Los Angeles, 25 Cal.App. 384, 143 P. 801. In extending a street railway, a municipality acts in a *proprietary* and not in a governmental capacity. Postal-Telegraph-Cable Co. v. City and County of San Francisco, 53 Cal.App. 188, 199 P. 1108, certiorari denied 257 U.S. 648, 42 S. Ct. 56, 66 L.Ed. 415.

■ The contention of the Government that this roadway and bridge, parcels 5, 6 and 7, could not be held proprietarily or privately, but only publicly, by reason of the fact "that funds other than harbor revenue funds were used therefor consisting not only of the proceeds from the bond issues, but general appropriations from the general funds of the City of Los Angeles" (Government's Brief p. 14) is answered in the City's reply brief by an interpretation of the word "private road" as follows: "Neither the City of Los Angeles nor the Board of Harbor Commissioners has ever contended, * * * that Badger Avenue and the bridge thereon was a 'private' roadway in the sense that it was for the benefit of any particular private individual or corporation. * * * The only meaning that private roadway can have in this case, considering all of the circumstances surrounding the acquisition of Roadway No. 2, is that it is a road acquired for the promotion of and to be used in connection with the operation of a proprietary func-

tion of the City of Los Angeles and the Board of Harbor Commissioners thereof. As we have outlined heretofore, all of the facts show that the roadway was not acquired just as a general public street for the general convenience of the citizens of the State, but it was rather acquired as an adjunct, as a facility, and as an improvement, and the bridge was constructed and used as a utility, appliance, or facility, for the promotion and accommodation of commerce, navigation, and fishery upon the lands and waters under the control and management of the Board of Harbor Commissioners. The result is, therefore, that when this road was posted as a private roadway, when it was acquired as a private roadway, when funds were used to purchase and construct it that could not be used for public street purposes, when the roadway and the bridge were placed under the jurisdiction of a department that had no powers relative to public streets and highways, the term 'private roadway' was in a sense thereby defined. No one has ever contended that the roadway and bridge were for the benefit of any private individual or person. * * *" (City's Reply Brief pp. 15, 16.) The court believes that the City's definition of a "private road", as hereinabove given, is the correct one.

It has been stipulated that near the intersection of Badger Avenue and Anaheim Street and near the intersection of Dock Street and Badger Avenue on Terminal Island. (See sketch 63 F.Supp. 179.) Badger Avenue has been continuously since its construction, was on the date of the filing of this condemnation action, and now is, in said locations posted by the Harbor Department with signs reading as follows: *"Notice This roadway is not a Public Dedicated Street. Permission to pass over same is subject to revocation at any time by the Board of Harbor Commissioners City of Los Angeles."* (Stipulation of Facts p. 23.) (Italics supplied.)

The Government's position that parcels 5 and 7, and the bridge over Los Cerritos channel, parcel 6, were a public road cannot be sustained.

*Dedication is necessary for a public street or road:*

Even if the City had desired to dedicate this road to the public as a public road the court cannot conceive how this could have been accomplished when the city had only a leasehold interest therein from the Los Angeles & Salt Lake Railroad Company (now Union Pacific Railroad Company) for a period of thirty years, which lease will not expire until April 2, 1964; *and it must be borne in mind that the city, in its governmental capacity, or in any other capacity, had never condemned this land from the Los Angeles & Salt Lake Railway Company as a public road.* (Italics supplied.) Condemnation proceedings would be necessary therefor.

■ A public body cannot declare private property to be a public street unless it has been dedicated by the owner for public street purposes. In re De Martini v. San Francisco, 107 Cal. 402, 40 P. 496; Cordano v. Wright, 159 Cal. 610, 115 P. 227.[3]

Counsel for the City of Los Angeles on the one hand, and for the Los Angeles & Salt Lake Railroad Company and the Union Pacific Railroad Company on the other hand, have entered into a stipulation of facts, filed July 10, 1945, "that the defendant, Los Angeles & Salt Lake Railroad Company, is the owner in fee of parcels Nos. 5 and 7" and that "in granting to the defendant, City of Los Angeles, the right to use said Roadway No. 2 in said agreements dated July 12, 1921, and April 3, 1934, the defendant, Los Angeles & Salt Lake Railroad Company, did not intend to dedicate, nor has the defendant, Los Angeles & Salt Lake Railroad Company at any time dedicated, Roadway No. 2 to the defendant, City of Los Angeles, for public street purposes; nor did the City of Los Angeles, by said agreements accept, nor has it at any time accepted, the use of Roadway No. 2 for public street purposes; that said Roadway No. 2 ever since its acquisition by the defendant, City of Los Angeles, has been, and now is, a private way of the defendant, City of Los Angeles."

[3] Whelan v. Boyd, 93 Cal. 500, 29 P. 69: "Dedication is never to be presumed without evidence of an unequivocal intention on the part of the owner." Quinn v. Anderson, 70 Cal. 456, 11 P. 746, 747; Huffman v. Hall, 102 Cal. 26, 30, 36 P. 417, 418. See California Nav. & Imp. Co. v. Union Trans. Co., 126 Cal. 433, at page 441, 58 P. 936, 46 L.R.A. 825; See also City of Oakland v. Oakland Water Front Co., 162 Cal. 675, 124 P. 251, and Gilfillan v. Shattuck, 142 Cal. 27, 75 P. 646.

It seems that "the City maintains a municipal ferry carrying passengers and motor vehicles across the main channel from San Pedro to Terminal Island at Los Angeles Harbor for which service a toll is charged for both passengers and vehicles using the ferry. This ferry is operated by the Harbor Department of the City in its proprietary capacity in the same manner as the Bascule bridge in question. * * *" (City's Reply Brief, p. 46); and parenthetically and without deciding the status of the ferry, for such a decision is not necessary in the instant case, the Court cannot conceive of any reason why the Harbor Department, as a matter of law, cannot operate a "private roadway and a bridge" (in the sense defined by the city) in a proprietary capacity the same as a ferry; and, in fact, the Harbor Department has placed a charge upon buses acting as common carriers of twenty five cents per bus each way across the bridge which has returned some revenue, which indicates that the City understood that the roadway and the bridge in question were proprietarily owned, operated and controlled.

*(3) Measure of compensation to which the City of Los Angeles is entitled for the taking, and which it will be permitted to prove at the trial.*

■ Preliminarily, the case of United States v. Miller, 317 U.S. 369, 380, 63 S. Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, has determined the question that the matter of fixing just compensation is to be determined by Federal decisions, and not by state law.

"We need not determine what is the local law * * *. They do not, and could not, affect questions of substantive right,— such as the measure of compensation,— grounded upon the Constitution of the United States." United States v. Miller, 317 U.S. 369, 380, 63 S.Ct. 276, 283, 87 L. Ed. 336, 147 A.L.R. 55.

■ The second question which counsel for the city desired decided at the pre-trial hearing (referred to by the court on page 10, line 8 of this Decision) pertains to the measure of value, or the measure of compensation, to which the city and/or the Harbor Department is entitled for the taking (reporter's transcript p. 18). The Government's position it seems, is that the city is entitled to only nominal damages, based on a line of cases determining the method of valuation when *public highways* or *public streets and alleys* are taken for governmental use.

This line of decisions will not be applicable at the trial, however, in view of the court's ruling that parcels 5, 6 and 7 were held *proprietarily* at the date of the taking; and the question for the jury to decide, as the court now views the situation prior to hearing the evidence to be adduced at the trial, will be the rental or lease value, at the date of the taking, of the *exclusive* right on the part of the Government to use one-half (or the exact portion taken) of the street or highway, and one lane across the Bascule type bridge, for the duration of their use by the Government.

While the Government contends that "if the court * * * should determine that Henry Ford Avenue and the bridge constituted a private way, the imposition of the public easement thereon in of such character under the facts in the case that only nominal damages can be allowed" (Government's brief p. 70), and that "under the stipulated facts * * * the award to the city of Los Angeles should be in the nominal sum of one dollar ($1.00), (Government's brief p. 71), the defendant City of Los Angeles contends, on the other hand, that, on the measure of damages for the temporary taking, the question is "what was the market value of such a franchise or easement, if any, on November 25th, 1942, the date of the taking; and states that, bearing upon this question, the defendant, City of Los Angeles, has a right to show at the trial by appropriate testimony and evidence:

"(1) That there were actual potential purchasers of such a franchise or easement; by showing that

* "(a) There was a demand in the open market therefor;

---

* "The defendant, City of Los Angeles," is in a position to show and prove by facts and expert witnesses that such an exclusive right to 32 feet in width of Roadway No. 2 and to one lane across the bridge as of the date of taking in this proceeding was very attractive in the open market for motor transit operations, having in mind the number of workers on the island as of that date and all of the other factors that would induce a motor transit company to seek and acquire such an exclusive right of use." (City of Los Angeles' reply brief p. 33). The city further contends that "the taking of parcels 5, 6 and 7 has destroyed, so far as the defendant, City of Los An-

"(b) The number of workers on Terminal Island then and in prospect were such as to require added transportation facilities, principally buses;

\*\* "(c) Access to the island was limited so as to place a premium upon the use of the bridge and Badger Avenue by common carriers;

"(d) An exclusive franchise or easement, eliminating as far as the user thereof was concerned a traffic bottleneck, would have increased the demand and number of purchasers therefor;

\*\*\* "(2) The cost of the bridge and roadway improvements when constructed, less depreciation;

"(3) The present reproduction cost of the bridge and roadway, less depreciation;

"(4) The actual revenue of the bridge before and after the taking of the rights condemned by the Government;

"(5) The cost of the maintenance of the bridge and roadway;

"(6) The cost of the operation of the bridge and roadway;

"(7) The value of or damage to improvements destroyed or damaged by the condemner's use of the bridge and roadway which will have to be replaced or restored when the property is returned to the city.

"(8) The offer made by the Maritime Commission of $1500.00 per month ($18,000.00 per year) for just the use of parcel 6 (one lane) on the bridge alone;

"(9) The opinion of experts as to the market value of the temporary easement sought to be condemned." (From defendant City's opening brief filed on May 22, 1945, pp. 18, 19).

The Court is satisfied that in this case the City of Los Angeles has lost, by reason of this condemnation action, for the temporary period of the taking, valuable rights that it would have continued to enjoy in parcels 5, 6 and 7 but for these proceedings, and that the City and/or the Harbor Department is entitled to be compensated therefor under the Federal Constitution.

The Court has pondered this request on the part of the City relative to evidence that will be admissible on the question of damages with considerable care, and finds that there is a relative paucity of cases dealing with the measure of damages to be allowed when an easement or use is taken temporarily, and not the fee.

In 20 C.J. 740, it is stated to be the rule that:

"Where land is taken, not to be held permanently, but only for a temporary use, the measure of compensation is not the market value, but what the property is fairly worth for the time during which it is held." (citing cases.) (see also cases cited in 29 C.J.S., Eminent Domain, § 142, p. 985, Note 51).

As to rental value see In re Condemnation of Lands, D.C., 250 F. 314; Johnson v. United States, 2 Ct.Cl. 391.

This seems to be the correct rule and an eminently fair rule to follow in this case; and, therefore, evidence of the market value of the bridge itself at the date of the taking which would be admissible if the fee itself were being condemned, will be inadmissible.

---

geles, and the Harbor Department is concerned, all of the special values that theretofore existed in Roadway No. 2 and the bridge, and has left to the said defendant only sufficient roadway. to comply with its commitments to the Union Pacific Railroad Company so as to prevent a forfeiture of all of its rights under said agreements." (Defendant City's reply brief p. 40).

\*\* The city expects to offer evidence to show " \* ⁙ \* that the navy bridge, the pontoon bridge, and the navy roadway, which in general parallels Badger Avenue to the east and is opposite the Bascule Bridge owned by the city of Los Angeles on Badger Avenue, was placed there by the navy, that is, it is a private navy bridge, and navy roadway, and the use thereof by the public, either the city of Los Angeles

public or the county, or the Long Beach public, is permissive only." The city expects to "offer evidence to show that at the time of this taking, exclusive of the present roadway of Badger Avenue and the bridge thereon and exclusive of this one navy bridge, there was no other connection between the mainland and Terminal Island." (Reporter's transcript of proceedings at pre-trial, p. 16) (See Stipulation of Facts, p. 23).

\*\*\* Attorney Nordstrom for the city stated that the City and/or the Harbor Department has about $1,500,000.00 invested in the whole road and the bridge, and that the actual cost of the bridge itself was around $1,000,000.00. (Reporter's transcript of proceedings at pre-trial, p. 22).

At the time of the trial, and subject to any decision in point holding to the contrary, which counsel for either side are invited to present to the Court for a specific ruling, the defendant City of Los Angeles will be permitted to show by competent, relevant and material evidence, as throwing light upon the rental or lease value of these parcels 5, 6 and 7, what the lease or rental value at the time of the taking would be as covered by requests 1–a; 1–b; 1–c and 1–d, supra.

Evidence pertaining to requests Nos. 2 and 3 (supra) will not be allowed, as being, in the court's opinion, immaterial on lease or rental value.

Evidence pertaining to requests Nos. 4, 5, 6 and 7 (supra) will be admitted.

As to request No. 8 (supra) evidence of the offer of the Maritime Commission of $1500.00 per month for the use of parcel 6 will likewise not be admissible as being prejudicial to the Government.[4]

As to request No. 9 (supra), the lease value of the easement may be shown.

The Court does not mean to indicate from the foregoing that counsel for either side will not be permitted to make their offer of proof on these points for the purpose of making, preserving and protecting their record on appeal, if they feel that the court has committed prejudicial error in the admissibility or non-admissibility of evidence.

*(4) The City has the right to damages to restore roadway and bridge to its original condition at the date of the taking.*

On the authority of United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 739, 156 A.L.R. 390, the court will likewise hold at the trial that the City of Los Angeles is entitled to damages for the destruction or depreciation of the city's equipment in connection with the roadway and bridge, as well as the cost of restoring the parcels to their original condition, as a result of the condemnation aforesaid by the Government for a term of years.

---

[4] Particular evidence held inadmissible (1) Evidence as to amount offered by condemnor during negotiations for purchase of property prior to taking—Goodyear Park Co. v. City of Holyoke, 298 Mass. 510, 11 N.E.2d 439; 20 C.J. p. 986, note 73-B from 29 C.J.S., Eminent Domain, § 273, p. 1262.