[Crim. No. 21958. May 19, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD LEE HAMILTON, Defendant and Appellant.

[Crim. Nos. 25303, S001870. May 19, 1988.]

In re BERNARD LEE HAMILTON on Habeas Corpus.

352

**COUNSEL**

Barry L. Morris, under appointment by the Supreme Court, for Defendant, Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Jay M. Bloom, John W. Carney, Michael D. Wellington and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—The cause in Crim. 21958 is before us on remand from the United States Supreme Court. It was last here on automatic appeal from a judgment of death. (Pen. Code, § 1239, subd. (b).) Defendant was convicted of first degree murder (*id.*, § 187), kidnapping (*id.*, § 207), robbery (*id.*, § 211), and burglary (*id.*, § 459). He was found to have committed the murder in the course of robbery (*id.*, § 190.2, subd. (a)(17)(i)), kidnapping (*id.*, subd. (a)(17)(ii)), and burglary (*id.*, subd. (a)(17)(vii)). He admitted that he had previously suffered convictions for forgery (*id.*, § 470) and for two counts of burglary (*id.*, § 459). He was sentenced to death.

When the cause was previously before us we held there was no reversible error at the guilt phase of the trial, but that under the general rule of automatic reversal of *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], the court's failure to instruct in accordance with *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], that intent to kill was an element of the felony-murder special circumstances, required the setting aside of the special circumstance findings and hence the reversal of the judgment of death. (*People* v. *Hamilton* (1985) 41 Cal.3d 408 [221 Cal.Rptr. 902, 710 P.2d 981] [*Hamilton I*].)

After seeking rehearing in this court without success, the Attorney General petitioned the United States Supreme Court for a writ of certiorari. The court granted the petition, ordered our judgment vacated, and remanded the cause for reconsideration in light of its decision in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101].

Subsequently, defendant in propria persona filed two petitions for writ of habeas corpus. (Crim. 25303 and S001870.) We consolidate the cause in Crim. 21958 and the proceedings in Crim. 25303 and S001870 for purposes of decision.

As we shall explain, we conclude, as we concluded in *Hamilton I,* that the judgment must be affirmed as to guilt. Contrary to our determination in *Hamilton I,* we now conclude that the special circumstance findings must be upheld: under *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240

Cal.Rptr. 585, 742 P.2d 1306], the court was not obligated to instruct on intent to kill with regard to the special circumstances here; and defendant does not present any other ground for setting aside the findings. We also conclude that the judgment must be affirmed as to penalty. Finally, we conclude that the petitions for writ of habeas corpus must be denied.

## I.  DIRECT APPEAL (CRIM. 21958)

### A.  *The Facts*

The facts of this case, which appear in *Hamilton I* at pages 413 to 419 of 41 Cal.3d, are relevant to our decision and are accordingly quoted in extenso below.

The evidence presented in the prosecution's case-in-chief tells the following tale. "On May 31, 1979, about 1 p.m., the body of Eleanore Frances Buchanan was discovered in the grass near a cul-de-sac off Pine Valley Road, near San Diego. Harry Piper noticed it while walking back to his car from target shooting. The body had no head or hands and was clothed only in a bra, underpants and socks.

"The body appeared to be in full rigor mortis when a deputy sheriff arrived at the scene between 1:30 and 2 p.m. Two strings of white cord were tied around the ankles, and there were dark blue fibers sticking to some blood on the body. There were marks on the wrists indicating that they had been tied together. A search of the area revealed no clothing or anything else that could be associated with the victim.

"Dr. Luibel, who performed the autopsy, was unable to determine the cause of death because of the absence of the head. (The head and hands have never been found.) He could, however, rule out natural causes. There were three long superficial incisions on the abdomen that appeared to have been inflicted after death. There was a horizontal stab wound on the abdomen that had probably been inflicted before death, but it did not penetrate the stomach or intestines. The right hand appeared to have been sawed off and the left one cut off with a knife. The head was probably removed by using both a knife and saw. Dr. Luibel could not say whether the victim was alive or dead when her head was cut off. The small amount of hemorrhage at the wrists suggested the victim was probably dead when her hands were cut off. The body was still in full rigor mortis at 4 p.m. on May 31, 1979, when Dr. Luibel examined it. Death would have occurred about 16 hours before then—about midnight the night before.

"Terry Buchanan, the victim's husband, testified that his wife had given birth to a baby boy three weeks before her death and that she was still

nursing him on May 30, 1979. That day Mrs. Buchanan left the house about 6:30 p.m. to go to a math class at Mesa College from 7 to 10 p.m. She was wearing tan levis, a beige and brown T-shirt, and was carrying a brown simulated leather purse. Mrs. Buchanan drove the family's only vehicle—a new blue van. There was very little gas in the tank because Buchanan planned to have the tank replaced the next day. Since Buchanan used the van during the day for his dental supply sales work, the van contained dental equipment and supplies. Buchanan said his wife was very security conscious and customarily locked the van. He also said that everything in the van was in good condition when she left.

"Mrs. Buchanan was last seen alive walking toward the parking lot from her math class about 9:30 p.m. Fellow students had given her copies of class notes for the classes she had missed because of the birth of her baby. Mrs. Buchanan had left class a little early because an optional quiz was given at 9:30 p.m.

"At 1:52 a.m. (California time) on May 31, 1979, defendant called his girlfriend, Donna Hatch, in Terrell, Texas from his parents' home in San Diego. He told Donna that he had a van and was planning to leave for Texas as soon as the gas stations opened in the morning.

"There was a gasoline shortage at the time, and gas stations were only open for limited hours. Between 4:45 a.m. and 10:15 a.m. on May 31, 1979, defendant used Terry and Eleanore Buchanan's Visa card to buy gas in El Cajon, California. The card was used two more times that day to buy gas for the van—once in El Centro, California at a station that was open between 6 a.m. and 10 a.m., and once in Tucson, Arizona.

"When defendant arrived at Donna Hatch's home in Terrell, Texas on the evening of June 1, 1979, the van was dirty, had a broken arm on the driver's chair, a broken mirror, and a broken wing window on the passenger side. Defendant took Donna with him on errands in the van on June 1, 2 and 3, 1979. Donna saw some credit cards in the name of Terry and Eleanore Buchanan in the compartment between the seats. Defendant used the credit cards to buy gas and food while Donna was with him.

"On June 3, while Donna was in the van with defendant and her daughter, they saw a highway patrolman. When Donna turned back to talk to her daughter, defendant told her not to make any sudden moves because they could get shot. Later, defendant stopped at a pay phone to call his brother and his friend Clifford. Donna heard defendant tell his brother he had flown to Texas. Clifford testified that when defendant called him, he was watching a report on TV that the body of a white woman with her head and hands

cut off had been found; he told defendant about it. Defendant seemed nervous when he returned from talking to Clifford. He told Donna that he thought he had killed a man, but he did not want to tell her any details because she might not want to have anything to do with him if he told her. Defendant said he would let the van sit a while to see if anybody paid attention to it. He also said he needed some Texas license plates. He asked Donna to go with him to a car lot, but she refused.

"Donna broke up with defendant the next day. Defendant said that if Donna were upset about the fact that he had lied about his ex-wife being dead, he would kill his ex-wife. On June 6, defendant called Donna to discuss bringing her back to California to testify for him in a pending case. At one point, a friend of Donna's got on the phone. Defendant told Donna, 'I'm going to kill you and your friend, too. And you won't know when I'll be around because I don't have to be driving this van, I can be in another vehicle.' Donna never saw or talked to defendant after that phone call.

"Defendant continued using the Buchanans' credit cards to buy gas, food and other items. It was stipulated that on June 6 defendant charged a saw, screwdriver and set of wrenches at a local store, and on June 7, he bought a butcher knife and two shanks of twine at a variety store.

"While driving the van in Oklahoma on June 8, 1979, defendant was stopped by a deputy sheriff. The deputy ran a check of the van's VIN number and learned that it belonged to the homicide victim. Defendant was arrested and taken to jail. On the way to the jail he passed a poster offering a reward for David L. Wall, alias 'Spider.'

"On June 9, 1979, San Diego sheriff's deputies interviewed defendant in Oklahoma. They began by introducing themselves, saying that they had come to talk to defendant about the van. Defendant interrupted them, stating: 'Yeah, the guy told me yesterday, one that pulled the gun on me, that it had been involved in a homicide, and uh . . . .' Defendant was then advised of his *Miranda* rights, which he waived. Defendant told the deputies he had left San Diego in the van with Spider and Fran, a white woman who had left her husband for Spider. Spider's real name was Calvin Spencer. Fran and Spider were presently in Shreveport, Louisiana. They had given defendant the van and credit cards when he had said he did not want to stay in Louisiana. Defendant was shown a picture of Eleanore Buchanan with her baby. He said it looked like Fran, but Fran was a little skinnier.[1]

---

[1] At this point the opinion notes: "Fran was Eleanore Buchanan's nickname. It was on the school papers she had been carrying and on an unmailed birth announcement that had been in her purse." (41 Cal.3d at p. 416, fn. 2.)

Defendant said 'the only time I seen her' Fran was wearing light colored jeans and carrying a beige nonleather purse.

"Enroute to San Diego, defendant was disturbed about his arrest for murder and kept saying it was not going to stick because all the police had was a body they could not identify and a runaway wife."[2]

"Shortly after defendant's preliminary hearing, Terry Buchanan received a letter with defendant's county jail return address. It said, 'You are probably full of grief when you should be highly pissed-off . . .' because Fran was not dead but had left with Spider and was smoking Sherman Sticks. Buchanan turned the letter over to the district attorney's office.

"Steven Thomas, an inmate at the San Diego County jail, testified that on January 24, 1980, he had a conversation with defendant about his case. He asked defendant, 'Who are you trying to convince, Hamilton, me or yourself?' Defendant replied, 'Well, I did it but they'll never prove it.' Thomas reported the conversation to the guard. Thomas had been convicted of murder, robbery, forgery, burglary and escape. Thomas testified he was in the federal witness protection program against organized crime, but had not received any money from the United States with respect to that program.

"While transporting defendant between the jail and courtroom on August 21, 1979, Deputy Sheriff Parsons was tightening defendant's security chains. Defendant said, 'All right, you have your fun, I'll have mine later.' Parsons responded, 'I thought you already had your fun.' Defendant replied, 'Yeah, and I'll kill a lot more, too, and you may be first on my list.'

"Brandon Armstrong, a criminalist, testified that the blue fibers that had been on the victim's body could easily have come from the carpet in the victim's van. Blood on the carpet in the van matched the type and characteristics of the victim. Several hairs found in the carpet stains could have been hers. Armstrong also examined blood found on defendant's shoe and concluded that it had been smeared on when wet. The blood on defendant's shoe was type O—the victim's type.[3] Defendant's type was A.

"A questioned documents expert testified that defendant was the person who had signed Terry Buchanan's name to the credit card invoices." (41 Cal.3d at pp. 413-417.)

---

[2] At this point the opinion notes: "The body was, in fact, quickly identified by a number of distinctive features, which included moles, toenail polish, scars, recent episiotomy, and the nursing bra." (41 Cal.3d at p. 416, fn. 3.)

[3] At this point the opinion notes: "Armstrong testified on rebuttal that the blood on defendant's shoe could not have come from rubbing against the blood on the van's carpet." (41 Cal.3d at p. 417, fn. 4.)

The defense case was as follows. "Defendant's mother testified that he was at her house between 8 and 9 p.m. on May 30, 1979. She said that although she testified at the preliminary hearing that she did not remember seeing defendant on the evening of May 30, 1979, she later spoke to defendant who refreshed her recollection by reminding her of some things that had happened that evening.[4]

"Mary Brewer, a relative of defendant's who lived in Oklahoma City testified that defendant had visited her in the early part of June 1979. He gave her a ride in the van, and she did not remember seeing any blood in it.

"Defendant testified that he had never seen the victim alive or dead. He said he went to his sister-in-law's house after he left his parent's house about 9 p.m. on May 30, 1979. He saw the Buchanans' van parked on a street between 12:45 and 1 a.m. on May 31, 1979, while walking home from a 7-Eleven store after talking to Butch McIntyre.[5] The keys were in the ignition, the wing window was broken, and a purse was on the passenger seat. Defendant drove the van home, called Donna Hatch, put his clothes in it and left for Texas shortly before sunrise. Defendant said he broke the armrest on the driver's seat when he was moving from the passenger seat to the driver's seat. (The seats were swivel chairs with armrests.)

"Defendant explained that he had told the officers in Oklahoma that he had driven across the country with Spider and Fran because he did not want to get stuck with an auto theft charge.

"Defendant denied having threatened to kill Donna Hatch. He said he bought the saw and other items on June 6 before he spoke to Donna Hatch. He planned to use them to burglarize a store in Terrell. Defendant said he was attempting to distract Donna when he told her he thought he had killed someone; she was angry at him because she had just found out he had lied about his ex-wife being dead.

"David Faulkner, an entomologist, testified about an experiment he had conducted in an attempt to determine when the victim's body had been left at the cul-de-sac. Faulkner took a rabbit, with its head and forepaws severed, and at midnight put it where the victim had been found. The purpose was to determine the amount of insect activity that would occur. Faulkner

---

[4]At this point the opinion notes: "Defendant had written two letters to Donna Hatch after her preliminary hearing testimony attempting to refresh her recollection as to events that involved her." (41 Cal.3d at p. 417, fn. 5.)

[5]At this point the opinion notes: "McIntyre testified he saw defendant after watching the NBA game on TV. There had, however, been no game on May 30. There had been one on May 29, 1979." (41 Cal.3d at p. 418, fn. 6.)

testified that within a few hours of sunrise there were a lot of flies around the rabbit. Based on this experiment and his knowledge of the temperature on the morning of May 31, 1979, Faulkner concluded that the earliest the body would have been put there would have been 9 a.m. Faulkner admitted, however, that there is a great deal of variation in the degree to which insects are attracted to different human bodies.

"Parker Bell, a criminalist, testified that the blood on defendant's shoe was a smear, as opposed to a droplet or splatter. He thought the blood could have come from the carpet, but he acknowledged that there were no blue fibers in the blood. (The blue carpet shed badly.) On cross-examination, however, Bell admitted it was possible that the blood could have been smeared on defendant's shoe by having bumped one of the victim's bloody stumps.

"Dr. Ali Hameli, Chief Medical Examiner of the State of Delaware, testified that in his opinion the victim died between 9:30 and 12 p.m. on May 30. Dr. Hameli also thought that rigor mortis was present when the body was placed at the cul-de-sac and that the body could have been put there no earlier than 4 a.m. on May 31.

"Allen Biggs testified that he had been at the cul-de-sac about 10 a.m. on May 31, 1979. He had seen Mr. Piper's car but no body. Deputy Sheriff Crawford testified that tire tracks at the scene in the cul-de-sac did not match the tire tracks of the victim's van.[6]" (41 Cal.3d at pp. 417-419.)

B. *Hamilton I*

In *Hamilton I,* we considered the issues going to guilt raised by defendant and concluded that none required reversal. (41 Cal.3d at pp. 419-431.) We also concluded that in violation of our decision in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, the court failed to instruct the jury that intent to kill was an element of the felony-murder special circumstances. (41 Cal.3d at p. 431.) Further, we concluded that this error fell within the scope of the rule of automatic reversal laid down in *People* v. *Garcia, supra,* 36 Cal.3d 539, and outside the four narrow exceptions enunciated in that opinion. Specifically, we determined that only the so-called *Cantrell-Thornton* exception was potentially available (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267])—viz., that intent to kill was established as a matter of law and there was no contrary evidence worthy of consider-

---

[6] At this point the opinion notes: "Crawford had testified for the prosecution and had identified photos that showed drag marks from the roadway to where the body had been found. The drag marks appeared to start on the pavement." (41 Cal.3d at p. 419, fn. 7.)

ation. We then determined that the evidence adduced at trial showed that the exception was in fact not available here. Accordingly, we vacated the special circumstance findings and reversed the judgment as to penalty.

Thereupon the Attorney General filed his petition for a writ of certiorari on the issue whether the failure to instruct on intent to kill with regard to a felony-murder special circumstance is subject to harmless-error analysis. The high court granted the petition, vacated the judgment in *Hamilton I,* and remanded the cause to this court for further consideration in light of its decision in *Rose* v. *Clark, supra,* 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101].

### C.  *The Cause on Remand*

At the threshold, we must delineate the scope of review on remand.

■ Contrary to the parties' assumption, the cause in its entirety is properly before us. This is so because the United States Supreme Court vacated the judgment in *Hamilton I* and rendered the decision a nullity. Also contrary to the parties' assumption, the doctrine of law of the case does not bar reconsideration of any point decided in *Hamilton I.* The doctrine may be applied only when and to the extent the prior decision has binding force. (See *City of Oakland* v. *Oakland W. Etc. Co.* (1912) 162 Cal. 675, 677-678 [124 P. 251] [prior decision binding on points concurred in by the requisite number of judges, not binding on others].) Because the judgment in *Hamilton I* was vacated, that decision, of course, is a nullity and as such has no binding force.

### 1.  *Guilt Issues*

Pursuant to the mandate of the United States Supreme Court referred to above, we have reexamined that part of our former opinion dealing with the issues relating to guilt. (*Hamilton I, supra,* 41 Cal.3d at pp. 419-431.) Inasmuch as we deem it unnecessary to alter or amend our prior decision in that regard, we adopt it as our decision in this proceeding.

### 2.  *Special Circumstance Issues*

■ Renewing the point he made in *Hamilton I,* defendant contends the court erred by failing to instruct the jury that intent to kill was an element of the felony-murder special circumstance. The claim must be rejected.

In *People* v. *Anderson, supra,* 43 Cal.3d at page 1147, we held that the court must instruct on intent when there is evidence from which the jury

could find that the defendant was an aider and abetter rather than the actual killer. In this case, of course, all the evidence showed that defendant either actually killed Buchanan or was not involved in the crime at all; there was no evidence that he was an aider and abetter. Thus, the court did not err by failing to instruct on intent.

Since we have concluded that the court was not obligated to instruct on intent, we are not required to reach the issue to which the high court's remand order directed us—i.e., whether the failure to instruct on intent is subject to harmless-error analysis—and accordingly decline to do so.[7]

### 3. *Penalty Issues*

At the penalty phase the prosecution presented evidence to show that defendant, who was 29 years of age at the time of trial in 1981, had been involved in serious criminal activity virtually all his adult life. It was stipulated that defendant had suffered felony convictions for the following offenses: a 1971 forgery, two 1972 burglaries, a 1976 auto theft, and a 1976 Louisiana burglary.

The prosecution presented evidence that defendant robbed one Ruth Story on November 17, 1976. On that date, Story was about 55 years old and walked with a cane. As she was returning home from a store, she encountered a man and woman whom she did not know. The man knocked her to the ground and attempted to take her purse from her shoulder; she tried to get up; he pulled her into the street; she again tried to get up; he again knocked her to the ground and then pulled her onto the sidewalk, took her purse, struck her three times in the face with his fist causing serious injuries, and thereupon fled with his woman companion.

While he was in custody in Louisiana for his 1976 burglary, defendant wrote to Officer Patrick Birse of the San Diego Police Department. In his letter he complained that the Louisiana authorities had "railroaded" him and were subjecting him to physical abuse; stated that he wished to return to the San Diego area; confessed to the Story robbery; and requested that Birse urge the district attorney to have him extradited.

Subsequently, the San Diego police showed Story a photographic lineup in which defendant's picture appeared. Story identified defendant as the

---

[7] Defendant also contends the felony-murder-burglary special-circumstance finding must be set aside on the ground that the death penalty law does not include the burglary of a vehicle within the scope of this special circumstance. Because he has failed to show that the other special circumstance findings are invalid on any ground, defendant is properly death-eligible. (Pen. Code, § 190.2, subd. (a).) Hence, we need not reach this issue.

perpetrator, stating she was "about 80 percent certain." At a live lineup, however, Story failed to identify defendant as the perpetrator. She similarly failed to identify him at the preliminary hearing. Nevertheless, defendant was held to answer.

Not long after the preliminary hearing, defendant wrote to Story. In his letter he stated, "I know you don't know me personally, but I am the man accused in that November 1976 incident where you were robbed and hurt." He then said that he had made the confession in his letter to Officer Birse solely to be extradited from Louisiana, and that the confession was not true. Finally, he asked her help in clearing him of the robbery charge.

A few days later, defendant wrote to the San Diego District Attorney. In his letter, he said that he had made his confession as a result of coercion and was innocent of the robbery charge, and that it was in the office's best interests to dismiss the case. He added: "Your victim definitely knows me personally and intimately. Back in 1967-68 and '69, when I was just a young buck, she used to pay me for my sexual services. . . . She is an alcoholic and sex freak, which is no crime, but the fact is, she knows me and would therefore would [sic] know if I was the one who robbed her, of [sic] which she has already said I wasn't."

At the penalty phase, Story identified defendant as her assailant. She stated: "The way [defendant] sets his mouth looks very much the same as the man set his mouth when he hit me."

The prosecution called one Rosie Blackmon to prove that she had twice suffered battery at defendant's hands. Blackmon testified that from late 1978 to early 1979 she and defendant were lovers; she worked driving a taxi cab, and was studying to become a truck driver; the pair discussed marriage, but defendant stated he did not want his wife to drive trucks; one morning in February 1979, defendant prevented her from going to truck driver school by beating her about the head with his fist, and she subsequently ended their relationship; a couple of weeks later, defendant accosted her at her place of employment, she responded she had nothing to say to him, and he then knocked her down with a punch to the head and proceeded to kick her head, face, and arms.

The prosecution also presented evidence that on the morning of October 8, 1980, deputy sheriffs made a number of unsuccessful attempts to get defendant out of bed to attend trial; finally, defendant jumped to his feet, raised his fists to the deputies, resisted their efforts to take him to court, yelled obscenities, and spat in one deputy's face. Defendant attempted to show that he had been provoked and was subjected to excessive force.

In its case, the defense presented evidence to portray defendant as a human being and thereby move the jury to exercise mercy. In substance the evidence presented consisted of the testimony of family members and friends who asked that the jury spare defendant's life. These witnesses recalled defendant's religious upbringing, spoke of his human side, and recounted how he had been affected by the death of his younger brother.

a. *Right to Self-representation*

Defendant contends that he was denied his constitutional right to represent himself at the penalty phase in violation of *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. Specifically, he claims the court erred by denying a motion he filed on December 27, 1980, in which he requested that the court "relieve counsel or in the alternative permit defendant [to] represent himself."

To properly address the contention, we must summarize certain events that occurred before the court made the ruling at issue. Evidently at arraignment on July 12, 1979, Patrick O'Connor was appointed to represent defendant. On September 25, 1979, on defendant's motion O'Connor was relieved on the ground of incompatibility, and Jerome Wallingford was appointed in his place. On November 7, 1979, dissatisfied with the representation that Wallingford was providing, defendant again made a motion to relieve counsel; Wallingford joined in the motion; the court, however, denied the request. On November 26, 1979, apparently on defendant's motion Wallingford was relieved and Thomas Ryan and Vivian Camberg were appointed in his place. On May 1, 1980, defendant filed a motion requesting that the court relieve Ryan and Camberg and permit him to represent himself. At a hearing on May 9, 1980, defendant withdrew his motion and made a new motion requesting that the court appoint him as cocounsel; the court granted this request. On May 20, 1980, defendant, complaining of their performance, again moved to have Ryan and Camberg relieved and to be permitted to represent himself. Finding, inter alia, that defendant did not have "a legitimate objection, but [was] only grasping at anything he can think of to delay the proceedings," the court denied the motion.

On October 2, 1980, trial commenced with jury selection. On October 14, 1980, defendant again filed a motion to represent himself. On October 20, 1980, however, he asked that his motion be taken off calendar, stating as follows: "I looked at the problems involved and I feel that [they are] mostly misinterpretations and misunderstandings that possibly could be worked out . . . . I don't want new counsel and then again I don't think pro. per. is the answer to any problems I have right now." On November 3, 1980, defendant revived his motion, claiming essentially that counsel's perfor-

mance was inadequate in several particulars. Counsel responded with apparently satisfactory explanations on all counts. Finding, inter alia, that counsel "have done everything possible as far as I have been able to ascertain in the proper representation of Mr. Hamilton," and that defendant had a "proclivity to substitute counsel," the court denied the motion. Later that same day, the guilt phase began with preinstructions to the jury. On November 17, 1980, and December 8, 1980, defendant renewed his request to represent himself, each time without success. On December 9, 10, 12, and 15, 1980, defendant made a variety of complaints about counsel's performance, but was unable to persuade the court that any of them had merit. On December 16, 1980, the jury commenced deliberations.

On January 6, 1981, the jury returned its guilt phase verdicts and defendant filed the motion now in issue—viz., the request that "the court relieve counsel or in the alternative permit defendant [to] represent himself" during the penalty phase. The motion was based on the ground that counsel performed inadequately and failed to adopt the strategy and tactics defendant had proposed. That same day, the court appears to have summarily denied the motion.

At a hearing on January 15, 1981—five days before the penalty phase opened—defendant renewed his motion. Again, the court denied his request. In so ruling it stated as follows.

"I have had the opportunity to see this case from beginning to end and I think that Mr. Ryan and Miss Camberg have done an outstanding job in their representation of the defendant in the face of real adversity through Mr. Hamilton putting stumbling blocks in their path at almost every turn. [¶] It is almost as if Mr. Hamilton were attempting to sabotage his case. [¶] The complaints that Mr. Hamilton has made are, I find, totally and completely without merit.

"I think it would be a real travesty and a mockery if I were to permit Mr. Hamilton to represent himself. He has had violent confrontations with the deputies in the jail. He has had violent confrontations with other persons.

"I have found it necessary for Mr. Hamilton to be handcuffed and in shackles, in effect during the entire trial because I was, frankly, concerned about violence here in the courtroom, about his attacking anybody that might be immediately at hand, and I can assure you that I would be the most disturbed person in the world if I hadn't required that he be in shackles and somebody, either his attorneys or somebody close to Mr. Hamilton in the courtroom were seriously injured.

"I don't see that there is any change. I don't feel there is any change whatever in my feeling relative to Mr. Hamilton representing himself. He certainly can't represent himself, being in chains.

"Certainly, he'd be in an awfully awkward position to be attempting to roam around the courtroom with his exhibits in the condition he is in, and I am certainly not going to release him from the shackles during the balance of the trial.

"I can only say that Mr. Hamilton has done many things that he shouldn't have done during the course of the trial. He has seemed to, as I have indicated, put stumbling blocks in the path of his attorneys. He has made suggestions which were absolutely preposterous as far as trial tactics are concerned, and if he had followed those tactics, it would have been even, I mean, the result would have been absolutely disastrous from his standpoint of the presentation.

"I can't conceive of Mr. Hamilton representing himself in this final phase, the penalty phase of the trial, the portion of the trial which is going to determine whether he is sentenced to life imprisonment or whether he is sentenced to death. I think it would be a real travesty if I were to do otherwise."

In *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], we held that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. Accordingly, when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be. Furthermore, the defendant's 'technical legal knowledge' is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself. [Citation.] However, once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court. When such a midtrial request for self-representation is presented the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required. Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or

delay which might reasonably be expected to follow the granting of such a motion. Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request." (*Id.* at pp. 127-129, fns. omitted.)

We are of the opinion that the court's denial of the motion in question was not error. ■■ Because defendant's request was filed in the midst of the jury's guilt phase deliberations, it was not timely for purposes of invoking an absolute right of self-representation under *Faretta* v. *California, supra,* 422 U.S. 806. (*Hamilton I, supra,* 41 Cal.3d at p. 421 [motion made after jury selection but before opening statements held untimely].) Accordingly, it was within the court's discretion to grant the request or not. ■■ On review we cannot conclude that the court abused its discretion in denying the motion: having considered the *Windham* factors, the court made the reasonable determination that defendant should not be permitted to represent himself at the penalty phase. The fact that the court considered such irrelevant factors as defendant's inability "to roam around the courtroom" in shackles and his lack of competence in law does not undermine the soundness of its determination.

■■ Defendant claims that his *Faretta* motion was indeed timely and hence effectively invoked an unconditional right of self-representation. He argues that the penalty phase of a capital trial amounts in actuality to a separate trial, and that he made his motion within a reasonable time prior to the commencement of that phase. We must reject the point because its predicate is unsound.

First, as even defendant acknowledges, the penalty phase has no separate formal existence but is merely a stage in a unitary capital trial. Second and more important, the connection between the phases of a capital trial is substantial and not merely formal. For example, Penal Code section 190.4, subdivision (c), provides that as a general matter "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to [Penal Code] Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied . . . ." Subdivision (d) of that same section declares that "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026 shall be considered at any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase."

Thus, we conclude that defendant was not denied a constitutional right of self-representation.

### b. *Constitutionality of the Sentencing Formula of Penal Code Section 190.3*

■ Defendant contends that the sentencing formula of Penal Code section 190.3 (hereafter section 190.3) is unconstitutional on the ground that it withdraws from the trier of fact constitutionally compelled discretion and thereby undermines the reliability of the verdict. Section 190.3, factor (k), states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." The point defendant makes here, however, was rejected in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].

### c. *Brown Error*

■ Defendant may be understood to contend that former CALJIC No. 8.84.2, incorporating the mandatory sentencing language of section 190.3, may have misled the jurors to his prejudice as to the scope of their sentencing responsibility and discretion in violation of the constitutional principles set forth in *People* v. *Brown, supra*, 40 Cal.3d at pages 538-544.

In *Brown* we held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at pp. 538-544.) In conformity with settled constitutional principles, we interpreted the statutory language to require jurors to make " . . . 'an individualized determination on the basis of the character of the individual and the circumstances of the crime' " (id. at p. 540, italics deleted) and a " ' " . . . moral assessment of [the] facts . . ." ' " (*ibid.*)— and thereby decide "which penalty is appropriate in the particular case" (*id.* at p. 541).

Although in *Brown* we upheld the constitutionality of section 190.3, we nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead jurors as to the scope of their sentencing discretion and responsibility. (40 Cal.3d at p. 544, fn. 17.) Specifically, we believed that a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of an imaginary 'scale' " (*id.* at p. 541). We also believed that a juror might reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the

circumstances. (See *id*. at pp. 540-544.) For this reason we directed trial courts thereafter to instruct jurors in conformity with the principles set forth therein, rather than in the bare words of the statute. (*Ibid*.) With respect to cases—such as the present—in which the jurors had been instructed in the statutory language, we announced that we would examine each such appeal on its merits to determine whether the jurors may have been misled to the defendant's prejudice. (*Ibid*.)

We turn now to the case at bar. After reviewing the record of the penalty phase in its entirety, we cannot conclude that the jurors may have been misled to defendant's prejudice by former CALJIC No. 8.84.2. Indeed, we believe that they were adequately informed as to what they were to do, and how they were to proceed, in the determination of penalty, and that neither concern expressed in *Brown* was substantially implicated. In support we make the following observations. First, although in closing argument the prosecutor referred briefly to the mandatory sentencing language, he clearly acknowledged that the jurors were "called upon to make the tremendous decision, tough decision," and were given discretion by the law to that end. Second, in his closing argument defense counsel emphasized that it was the responsibility of the jurors, and the jurors alone, to determine whether the death penalty was appropriate for defendant. Third, at defendant's request the court instructed the jurors as follows: "In weighing the aggravating and mitigating factors, you are not to merely count numbers on either side. You are instructed rather to weigh and consider the factors on each side as a whole"; and, "In order to impose a death sentence, you must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweigh[s] the totality of the mitigating circumstances."

Thus, on this record we find no *Brown* error.

d. *Easley "Factor (k)" Error*

■ Defendant may be understood to contend that the pre-*Easley* (*People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813]) CALJIC No. 8.84.1, factor (k) instruction (hereafter former factor (k)), which was given in this case, may have misled the jurors as to the scope of their sentencing responsibility and discretion to defendant's prejudice.

Pursuant to former CALJIC No. 8.84.1, the court instructed the jurors that in determining the penalty they should consider several specified circumstances and also "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

In *People* v. *Easley, supra,* 34 Cal.3d 858, we concluded that the language of former factor (k) might mislead the jurors about the scope of their

discretion and responsibility under the federal Constitution as construed in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869], in which the United States Supreme Court held that a sentencer may " 'not be precluded from considering *as a mitigating factor,* any aspect of the defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (Italics in original.)

Because of the potentially misleading language of the instruction, we directed trial courts thereafter to inform the jury that they may consider in mitigation not only factor (k) but also "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (34 Cal.3d at p. 878, fn. 10.)

In *People* v. *Brown, supra*, 40 Cal.3d 512, we announced that with respect to cases—such as the present—in which the jury had been instructed pursuant to the former factor (k), we would examine each such appeal on its merits to determine whether the jury may have been misled to the defendant's prejudice. (*Id*. at p. 544, fn. 17.) In conducting such an examination, we look to " 'the totality of the penalty instructions given and the arguments made to the jury' . . . ." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 786 [230 Cal.Rptr. 667, 726 P.2d 113].)

We turn now to the case at bar. After reviewing the record of the penalty phase in its entirety, we cannot conclude that the jurors may have been misled to defendant's prejudice by the former factor (k) instruction. Indeed, we are of the opinion that the jurors were in fact adequately informed that they could consider character and background evidence. After the defense presented a case that consisted entirely of such evidence, the court instructed the jurors as follows: "The mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Mr. Hamilton. You should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances presented as reasons for not imposing the death sentence."

Thus, on this record we find no *Easley* "factor (k)" error.

e. *Ramos Error*

■ Defendant contends that the court committed reversible error under *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. In accordance with the so-called Briggs Instruction (former CALJIC No.

8.84.2 (1979)) the court delivered the following charge: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole."

In *People* v. *Ramos, supra,* 37 Cal.3d at page 153, we held that "the Briggs Instruction is incompatible with [the] guarantee of 'fundamental fairness' [established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations."

As to the misleading character of the instruction, we stated as follows. "Under the California Constitution, the Governor's power of commutation or pardon extends equally to a sentence of death and to a sentence of life without possibility of parole. [Citation.] The Briggs Instruction, however, informs the jury only that a sentence of life without possibility of parole may be commuted. Although the instruction is literally accurate as far as it goes, it is a classic example of a misleading 'half-truth.' Since the instruction is only given in a penalty trial—when the jury's attention is narrowly focused on two alternative punishments—the instruction would reasonably be understood by the average juror to mean, by negative implication, that while a sentence of life without possibility of parole may be commuted, a sentence of death may not. Viewed realistically and in context, the instruction provides the jury with seriously misleading information." (37 Cal.3d at p. 153, fn. omitted.)

Further, we explained that "there are a variety of reasons why . . . consideration [of the commutation power] is improper. The first and perhaps most obvious problem is the speculative nature of the inquiry that the instruction invites. . . . [¶] . . . Here, the jury must attempt to determine not only what a particular defendant will be like in the future but also what some presently unknown person—a future Governor—will do in response to the defendant's then condition. . . . [¶] Furthermore, . . . any instruction which draws the jury's attention to the possibility of future actions by a governor or parole board is likely to affect the jury's decisionmaking process in either of two illegitimate—though very different—ways, diverting the jury from its proper function. [¶] The first vice of such an instruction . . . is that it may tend to diminish the jury's sense of responsibility for its action." (*Id.* at pp. 156-157.) ' Second, . . . an instruction on the possibility of commutation invites the jury to go beyond its proper role and attempt to 'preempt' the Governor's constitutional authority by imposing a sentence

that will at least minimize the opportunity for such a commutation." (*Id*. at p. 158.)

Under *Ramos,* we conclude that the court erred by charging the jury in accordance with the Briggs Instruction: the language of the instruction is misleading and invites speculation on irrelevant and improper matters.

The Attorney General argues in substance that a supplementary charge, delivered by the court immediately after the Briggs Instruction, made that instruction nonerroneous or in any event nonprejudicial. As relevant here, the court's full instructions were as follows.

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on Mr. Hamilton.

"You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole. This is subject to the requirement that, in the case of any person twice convicted of a felony, a commutation or modification may not be granted absent the written recommendation of at least four justices of the California Supreme Court. Further, a life sentence requires a minimum incarceration of 25 years less one third off for good time credits before parole may be considered by the proper authorities.

"You are now instructed, however, that the matter of a possible commutation or modification of sentence is not to be considered by you in determining the punishment for Mr. Hamilton. You must not speculate as to whether such commutation or modification would ever occur. It is not your function to decide now whether this man will be suitable for parole at some future date. So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive. If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the governor, the Supreme Court, and those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that Mr. Hamilton will not be paroled unless he can be safely released into society. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the governor and other officials will properly carry out their responsibilities."

Having considered the matter closely, we cannot agree that the supplementary charge somehow rendered the Briggs Instruction free of error: that charge does not alter the objectionable language, which continues to mislead and to invite speculation on irrelevant and improper matters.

We do agree, however, that on this record the error was nonprejudicial. As stated above, the court instructed the jurors *"not* to . . . consider[]" "the matter of a possible commutation or modification of sentence . . . in determining the punishment for Mr. Hamilton," *"not* [to] speculate as to whether such commutation or modification would ever occur" and *"not* . . . to decide now whether this man will be suitable for parole at some future date." Defendant argues that the supplementary charge did not cure the harm of the Briggs Instruction, but rather led the jurors to indulge in irrelevant and improper speculation. The clear meaning of the plain words of the admonition, however, refutes this argument.

The court also delivered the following charge. "I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case."

Through these instructions, the court directed the jurors not to make any use of the Briggs Instruction in determining the penalty to be imposed on defendant. Jurors are, of course, presumed to follow the instructions given by the court. (E.g., *Delli Paoli* v. *United States* (1957) 352 U.S. 232, 242 [1 L.Ed.2d 278, 285-286, 77 S.Ct. 294].) In this case we find no reason to believe that the jurors failed to discharge their duty.

Defendant argues in substance that the prosecutor exploited the Briggs Instruction in closing argument and thereby made the harm threatened by the instruction incurable. The comment complained of is as follows: "Now, [defense counsel will] say, 'If you give him life in prison, he will have to spend the rest of his days thinking about his crimes and thinking about the victims.' No way. . . . This defendant wouldn't spend all his time in prison thinking about his horrible crime. He'd be conniving and devising ways to manipulate the system and get out. Look at his letters [to Officer Birse, Ruth Story and the San Diego District Attorney's office] now, how he operates."

We do not believe that the prosecutor intended this comment to refer to the Briggs Instruction. Had he desired to anticipate that charge, he would

evidently have touched on the Governor's commutation power expressly or at least by clear implication. But as the words of the remark show, he did not do so. More important, we do not believe that the jury would have understood the comment to refer to the instruction: the remark does not even allude to the commutation power. In any event, the comment was brief and isolated. As such, it could not make the error in this case incurable.

Hence, we conclude that on the facts of this case the giving of the Briggs Instruction did not amount to reversible error.

f. *Consideration of Invalid Felony Murder-burglary Special Circumstances*

■ Defendant contends that the felony murder-burglary special-circumstance finding was invalid (see *ante,* fn. 7) and, as such, was improperly presented to the jurors as evidence in aggravation under the instruction directing them to consider "the existence of any special circumstance found to be true." He then contends that the error requires reversal. We cannot agree. Assuming for argument's sake that the finding was invalid, we are nevertheless of the opinion that even if the jurors had not been instructed to consider the existence of this finding, they still would have returned a verdict of death: whereas the evidence in aggravation—even without the finding—was overwhelming, the evidence in mitigation was minimal.

g. *Failure to Exercise Discretion to Strike the Special Circumstance Findings*

Defendant contends the court committed reversible error by failing to expressly consider at the statutory penalty-modification hearing whether it should strike the special circumstances findings on its own motion "in furtherance of justice" under Penal Code section 1385 in order to reduce his sentence to imprisonment with possibility of parole. He argues that under the 1973 death penalty law as construed in *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101], the trial court lacked authority to strike special circumstance findings, but under the 1978 death penalty law as construed in *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], the court generally has such authority; because trial in this matter took place after *Rockwell* but before *Williams*, the court may have mistakenly believed it lacked authority to strike the findings; therefore, to prevent the possibility of prejudice we should vacate

the penalty judgment and remand the cause to the trial court with directions to expressly consider whether it should strike the findings "in furtherance of justice."

The argument is unpersuasive. Although under the 1978 law the court has the authority to strike the special circumstance findings *before* a verdict of death (*People* v. *Williams, supra,* 30 Cal. 3d at pp. 477-490), it is an open question whether it retains that power *after* such a verdict (*id.* at p. 490, fn. 11). ■ But assuming arguendo that the court has the authority, we believe that the claimed failure of the court here to expressly consider whether it should strike the findings could not have been prejudicial and that remand would serve no purpose: there are simply no facts in the record to support an exercise of that power in defendant's favor.

■ Finally, we are of the opinion that in view of the theories presented and the evidence introduced, the jury's guilt phase verdicts imply a finding that defendant was the actual killer (*Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]). Having reviewed the record in its entirety, we conclude that this finding is amply supported by the evidence and adopt it as our own. Accordingly, we hold that the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689, 697].)[8]

## II. HABEAS CORPUS (CRIM. 25303)

In his petition for a writ of habeas corpus in Crim. 25303, defendant bases his claim to relief on three grounds. He first asserts he was not provided with effective assistance by trial and appellate counsel. ■ To establish such a point, a defendant must show that counsel (1) performed at a level below an objective standard of reasonableness under prevailing professional norms; and thereby (2) subjected the defense to prejudice, i.e., in the absence of counsel's failings a more favorable outcome was reasonably probable. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) As we shall explain, defendant fails to make a prima facie case of entitlement to relief.

---

[8] After oral argument defendant submitted a number of motions in propria persona asking that appointed appellate counsel be relieved and other specified counsel be substituted in his place. Because each of these attorneys has declined to state he is available or has declared he is unavailable, we deny the motions.

■ Defendant alleges broadly that trial counsel made various errors in strategy and tactics and, more specifically, that they feared him and treated him with distrust. Such assertions do not effectively allege either deficient performance or prejudice.

He also alleges appellate counsel refused to argue that facial expressions and gestures trial counsel assertedly made during jury selection prejudiced the defense. This statement too fails to effectively allege either deficient performance or prejudice.

Defendant next claims that he was denied due process because the trial judge was biased. In support of his point, he cites the following incidents: (1) in an in camera hearing the judge stated he believed trial counsel and did not believe defendant in a dispute as to whether counsel had threatened him with harm; and (2) in another in camera conference, the judge told him, "You have proven yourself an unmitigated liar during the course of this whole trial." ■ But the fact that the judge made these statements— each of which is more than adequately supported by the evidence—does not amount to a prima facie showing of bias: " '[W]hen the state of mind of the trial judge appears to be adverse to one of the parties but is based upon actual observance of the witnesses and evidence given during the trial of an action, it does not amount to . . . prejudice . . . .' " (*People* v. *Yeager* (1961) 55 Cal.2d 374, 391 [10 Cal.Rptr. 829, 359 P.2d 261].)

Defendant's final "claim" is in substance as follows: he states that at the new trial that might have followed our decision in *Hamilton I* the court would again deny his request to represent himself. Whether or not the court would so rule in the future raises no issue cognizable on habeas corpus. In any event, because we affirm the judgment in its entirety there will be no such new trial.

## III. HABEAS CORPUS (S001870)

In his petition for a writ of habeas corpus in S001870, defendant bases his claim to relief on what are in substance four grounds. He first asserts he was not provided with effective assistance by trial and appellate counsel. As will appear, he fails to make a prima facie case.

To begin with, we seriously doubt defendant has adequately alleged deficient performance on the part of counsel. His first complaint is that

counsel failed to communicate with him or to allow him to participate in the development of strategy and tactics. The charge, however, is conclusory and without specificity. The second complaint is that counsel failed to fully investigate the facts of the case. This charge runs in substance as follows: Buchanan, as is undisputed, left class on the night of May 30, 1979, before an optional quiz was given; a copy of that quiz was subsequently found in the van; that copy—defendant conjectures—*must* have been brought to the van by one of Buchanan's classmates; that classmate—defendant declares—*may* have been the killer; counsel knew that Buchanan had left class before the quiz was given, and knew that a copy of the quiz was found in the van; therefore, counsel should have sought evidence about the classmate. We doubt, however, that counsel's performance can be called deficient. There was simply nothing more than the merest speculation that an unknown classmate may have gone to the van and may have killed Buchanan. Without something more, it is difficult to conclude that counsel was obligated to investigate further.

In any event, we are of the opinion that defendant has not adequately alleged prejudice. Indeed, he has wholly failed to show that absent counsel's alleged failings a more favorable outcome in the guilt phase was reasonably probable on the facts of this case.

Defendant next claims that the prosecution introduced "False evidence . . . substantially material or probative on the issue of guilt" (Pen. Code, § 1473, subd. (b)(1)). His complaint is in essence as follows: the optional quiz *must* have been brought into the van by one of Buchanan's classmates; the prosecution was aware of this fact, but presented its case as though Buchanan brought the quiz to the van herself. The premise is unsound: the record establishes that after class Buchanan spoke with friends who had taken the quiz, probably obtained a copy from one of them, and therefore may have brought it to the van herself. Hence, defendant fails to make a prima facie case.

Defendant also claims that he had a right to be present at a pretrial hearing conducted on July 6, 1981. At that hearing, the court in essence established a schedule under which a defense criminologist could examine the van, which was then in storage in Oklahoma, before it was driven back to California by agents of the prosecution. Again, as will appear, no prima facie case is made.

It is the rule that "the accused is not entitled to be personally present . . . [on] matters in which defendant's presence does not bear a ' "reasonably

substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149], citing cases (plur. opn.).) Under this rule, defendant did not have a right to be present at the hearing: his attendance at what was essentially a scheduling hearing would not have been useful or of benefit to the defense.

■ Defendant's final claim is that the prosecution interfered with his attempt to obtain evidence. Specifically, he charges that the prosecution had the van examined and cleaned before the defense criminologist could subject it to inspection and tests. It is of course the rule that "in no event can duly constituted authority hamper or interfere with efforts on the part of an accused to obtain [evidence] . . . , without denying him due process of law." (*In re Martin* (1962) 58 Cal.2d 509, 512 [24 Cal.Rptr. 833, 374 P.2d 801] [blood sample to determine intoxication].) The petition, however, fails to adequately allege interference: it states that the prosecution had the van examined and cleaned before the defense criminologist could begin his work; it does not state that the criminologist acted without undue delay or that the delay on his part was attributable to the prosecution.

The judgment is affirmed. The petition for writ of habeas corpus in Crim. 25303 is denied. The petition for writ of habeas corpus in S001870 is denied.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—Concurring and dissenting.—I concur in the affirmance of the findings of guilt and special circumstances and in the denials of the petitions for writ of habeas corpus. I dissent from the affirmance of the death penalty.

The majority properly conclude that the trial court erred in giving an instruction in accordance with the so-called Briggs Instruction (former CALJIC No. 8.84.2 (1979)) on the Governor's power to commute a sentence of life without possibility of parole. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 153 [207 Cal.Rptr. 800, 689 P.2d 430].) As the majority recognize, the language of the instruction is misleading and invites speculation on irrelevant matters. However, the majority also conclude that subsequent instructions telling the jury to disregard the Governor's power to commute eliminated any prejudice. I do not agree.

In my view the error was prejudicial. I cannot agree that the later instructions unrung the bell. Far from unringing the bell, the subsequent instructions could only have the effect of reminding the jury again and again of the Governor's commutation power. Furthermore the prosecutor exploited the error in closing argument. To conclude that, when the cacophony was complete and overwhelming, there was no prejudice is to turn a deaf ear to fairness and justice.

The Briggs Instruction has been uniformly held to be prejudicial error in a penalty trial because it is so misleading as to constitute a denial of due process, improperly tilting the jury in favor of the death penalty. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150-1151 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Myers* (1987) 43 Cal.3d 250, 272-273 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Monteil* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 861-863 [180 Cal.Rptr. 640, 640 P.2d 776].) In *Anderson,* it is stated that the Briggs Instruction "necessarily subjects the defendant to prejudice." (43 Cal.3d at p. 1151.) As pointed out in *Myers*: "The Attorney General . . . has cited no instance, and we are aware of none, in which this type of instructional error has been found nonprejudicial in a death penalty case, and in view of the very serious potential for prejudice emphasized in *Ramos,* we strongly doubt whether we could ever confidently conclude that there was no reasonable possibility that this instruction improperly tainted the jury's decision-making process." (43 Cal.3d at p. 272.)

In *Myers,* the defendant introduced evidence of the past practices of California governors to show that it was extremely unlikely that he ever would be released if sentenced to life without possibility of parole. The court concluded that far from neutralizing the improper instruction "in reality the additional focus on commutation in this case had the inevitable and unfortunate effect of highlighting the ostensible importance of the commutation question." (43 Cal.3d at pp. 272-273.)

In this case the trial court's instruction to the jury that it was their duty to determine whether death or confinement in state prison without possibility of parole should be imposed on defendant was followed immediately by its instruction on the Governor's commutation power. The court thereby emphasized the importance of the instructions on the Governor's powers, suggesting that they are the first and most important step in the process of determining the penalty.[1]

---

[1] "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on Mr. Hamilton.

The importance of the Governor's powers was further emphasized because of their length; the instructions went beyond those contemplated by Penal Code section 190.3, the Briggs Instruction.

The first instruction was not limited to the Governor's power to commute a sentence of life imprisonment without possibility of parole. Rather it spoke of the Governor's powers generally. Subsequent instructions told the jury of the Governor's power to commute a sentence of life imprisonment without possibility of parole to a sentence of life imprisonment with parole, a limitation on the power, and the effect of a commutation. The instructions did not stop with the instruction contemplated by Penal Code section 190.3 condemned in *Ramos* but repeatedly emphasized the Governor's power. The instructions thus were not the brief but invalid reference to the Governor's power contemplated by Penal Code section 190.3 but included in addition an instruction applicable to a death sentence and instructions detailing matters which could only serve to toll the bell repeatedly. While the majority concede that error occurred (maj. opn., p. 374), they do not recognize the full scope of the error.

The majority further take the position that subsequent instructions told the jury to disregard the prior instructions, that we must presume the jury followed the later instructions and that they eliminated the prejudice due to the erroneous instructions on the Governor's powers. (Maj. opn., *ante,* at p. 375.)

I doubt whether any instruction could eliminate the prejudice flowing from the improper and detailed emphasis placed on the Governor's commutation power. The power was given too much importance and emphasis to allow further instructions to eliminate the prejudice. Furthermore the subsequent instructions given in the instant case were in themselves erroneous, confusing and contradictory and, when all was said and done, probably left the jury with the view that it should consider the Governor's powers so long as it assumed that the powers would be properly exercised. Such instruc-

---

"You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.

"This is subject to the requirement that, in the case of any person twice convicted of a felony, a commutation or modification may not be granted absent the written recommendation of at least four justices of the California Supreme Court. Further, a life sentence requires a minimum incarceration of 25 years less one third off for good time credits before parole may be considered by the proper authorities."

tions do not eliminate the prejudice flowing from the improper mention of the Governor's powers; they exacerbate the prejudice.[2]

Like the evidence of past Governor practices in *People* v. *Myers, supra,* 43 Cal.3d 250, 272-273, the instructions relied upon by the majority in the instant case, far from neutralizing the improper instructions on the commutation power, served to emphasize the commutation question. The jury was initially told not to consider a possible commutation or to speculate whether there would be a commutation, and it was not its function to determine whether defendant would be suitable for parole at a later date. But telling the jury not to consider a possible commutation, to speculate, or to decide whether this man will be suitable for parole at some later date simply emphasizes the commutation question in the juror's mind.

Moreover, the jury was not told to ignore the Governor's power but was told that the Governor, the Supreme Court and the parole officials would properly perform their duties. In *Ramos,* after concluding that fundamental fairness precluded telling the jury of the commutation power, the court addressed the question whether the jury should be told *not* to consider the Governor's commutation power. While we recognized that in some circumstances not relevant here the jury might be told to disregard the power, we concluded that the jury should not be so instructed because the instruction "is simply more likely to bring the matter to the jury's attention and, as a practical matter, be difficult to follow." (37 Cal.3d at p. 159, fn. 12.) Accordingly, even if no commutation instruction had been given, it would have been error in the instant case to give the supplementary instructions because they called the jury's attention to the commutation issue. To conclude, as the majority do, that an instruction which is erroneous because it may call the jury's attention to a prejudicial matter somehow eliminates the prejudice in other instructions which call the jury's attention to the very same prejudicial matter involves a mental exercise incomprehensible to me.

---

[2] "You are now instructed, however, that the matter of a possible commutation or modification of sentence is not to be considered by you in determining the punishment for Mr. Hamilton. You must not speculate as to whether such commutation or modification would ever occur.

"*It is not your function to decide now whether this man will be suitable for parole at some future date.* So far as you are concerned, you are to decide only whether this man shall suffer the death penalty or whether he shall be permitted to remain alive.

"*If upon consideration of the evidence you believe that life imprisonment without possibility of parole is the proper sentence, you must assume that the Governor, the Supreme Court, and those officials charged with the operation of our parole system will perform their duty in a correct and responsible manner, and that Mr. Hamilton will not be paroled unless he can be safely released into society.*

"It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Governor and other officials will properly carry out their responsibilities." (Italics added.)

But even if we accept the majority's thesis that somehow instructions which are error because of their prejudicial effect can somehow cure other instructions which are error because they have the same prejudicial effect, we still must look at the content of the subsequent instructions of the trial court.

Far from being told that it was improper to consider the possibilities of commutation and subsequent parole, the jury was told that it should consider those possibilities but only in the perspective that, when and if defendant was paroled, it would be done lawfully. The instructions to disregard and not to consider were literally contradicted and the jury was left with not only erroneous instructions but also contradictory and confusing instructions as to the importance of the Governor's commutation power.

What did this jury do when faced with confusing and conflicting instructions concerning the Governor's commutation power? All we can do is guess. I suspect that the jury may have concluded that it should not try to determine whether this defendant would have his sentence commuted and obtain a parole but that it must conclude that the commutation power was a factor militating against life imprisonment without possibility of parole and in favor of the death penalty and that it must assume that if defendant was paroled it would be done lawfully. To execute a defendant based on the Governor's power to commute sentences whether done lawfully or unlawfully violates the fundamental fairness guaranteed by the due process clause of our state Constitution.

The prosecutor exploited the fundamental unfairness of the instructions in his closing argument. The prosecutor suggested that if defendant received a sentence of life imprisonment he "wouldn't spend all his time in prison thinking about his horrible crimes. He'd be conniving and devising ways to *manipulate the system and get out.* . . . Look at his letters [to Officer Birse, Ruth Story and the San Diego District Attorney's office] now, how he operates." (Italics added.) The comment is a direct comment on the possibility that defendant would be paroled. The only way that he could "manipulate the system and get out" by appealing to governmental authorities was through exercise of the commutation power. The majority suggest that the prosecutor was only trying to state that defendant was lacking in feeling and self-centered (maj. opn., p. 374), but the comment speaks for itself.

In the instant case the instructions discussing the Governor's powers were as long as those setting forth and defining the aggravating and mitigat-

ing circumstances which should control the application of the death penalty. I am satisfied that the instructions on the Governor's powers were more harmful than any we have seen in prior cases. The supplemental instructions relied upon by the majority did not eliminate the prejudice but could only have emphasized the commutation power and confused the jury into believing that the power was an important matter, if not the most important matter, to be considered by the jury in determining the penalty. The prosecutor referred to possible parole in his closing argument, and the prejudice from the errors is overwhelming.

The petitions of all parties for a rehearing were denied July 28, 1988, and the opinion was modified to read as printed above. Broussard, J., was of the opinion that the petitions should be granted.